### CORBY *v.* THOMPSON.

1. PUBLIC LANDS—PATENTS—STATUTES—CONSTRUCTION.
    The act of ·congress of April 17, 1828 (4 U. S. Stat. chap. 28), confirming certain land claims in the Territory of Michigan, was a direct legislative grant of such lands, the claims to which had been approved and recommended by the commissioners, and no patent was necessary to pass title, although a patent might subsequently be issued.

2. ADVERSE POSSESSION—QUIETING TITLE—EVIDENCE—SUFFICIENCY.
    On a bill to quiet title evidence *held*, sufficient to show adverse possession by plaintiffs of the land.

3. SAME.
    Evidence *held*, sufficient to show that plaintiffs' possession of a certain portion of lands into possession of which plaintiffs' and defendants' ancestors had entered in common was of such character as to impart information and give notice to plaintiffs' cotenants in common that adverse possession was intended to be asserted against defendants.[1]

---

[1] On presumption· of ouster of one tenant in common from long continued possession of another, see note in 10 L. R. A. (N. S.) 185.

4. SAME.
> A bill to quiet title to lands, based upon adverse posses-
> sion, which alleged adverse possession without also alleg-
> ing that such possession was exclusive was sufficient.

Appeal from Wayne; Chester, J., presiding. Sub-
mitted January 12, 1917. (Docket No. 121.) De-
cided June 1, 1917. Rehearing denied September 28,
1917.

Bill by Abbie Corby and others against Adele
Campau Thompson and others to quiet title to land.
From a decree for plaintiffs, defendants appeal. Af-
firmed.

*Arthur E. Schreiter* (*Munro & Powell,* of counsel),
for plaintiffs.

*Daniel J. Campau* and *Moore & Moore,* for de-
fendants.

KUHN, C. J. This bill is filed by the plaintiffs to
quiet the title of certain land situated in the township
of Gratiot, Wayne county, Mich., known as private
claim No. 11. The testimony establishes that one
Joseph Pomerville, who was born in 1756 and died in
1796, at one time occupied the land which is now the
subject-matter of this litigation. It appears that he
left six children, and some years after his death com-
missioners were appointed by the Federal government
to investigate and ascertain whether his heirs should
be given this land. In 1828, the land was surveyed,
and the commissioners reported in favor of a gift to
the heirs. In the same year, the Federal congress
passed an act (4 U. S. Stat. chap. 28) which contained,
in part, the following provisions:

"An act to confirm certain claims to lands in the
Territory of Michigan.
"Be it enacted by the Senate and House of Repre-
sentatives of the United States of America, in Con-

gress assembled, That the claims purporting to be confirmed, or recommended for confirmation, by the commissioners appointed to carry into effect the 'Act to revive the powers of the commissioners for ascertaining and deciding on claims to lands in, and for settling the claims to lands at, Green Bay and Prairie du Chien, in the Territory of Michigan,' passed on the eleventh day of May, one thousand eight hundred and twenty, which are contained in volumes 2, 4, and 5, be, and the same are, confirmed.

"SEC. 2. And be it further enacted, That the claims purporting to be confirmed, or recommended for confirmation, by the commissioners appointed to carry into effect 'An act to revive and continue in force certain acts for the adjustment of land claims in the territory of Michigan,' passed the twenty-first of February, one thousand eight hundred and twenty-three, which are contained in volumes 1, 3, 6, 8, and 9, of said reports, *be, and the same are hereby, confirmed.*

"SEC. 3. And be it further enacted, That the Secretary of the Treasury, under the direction of the President of the United States, be, and he is hereby, authorized and required, as soon as may be, to adopt such measures as may be necessary, to give full effect to the reports of the commissioners which are enumerated in the first and second sections of this act: *Provided, That this act shall not be so construed as to prejudice the rights of third persons,* or to impose any obligation, on the part of the United States, to make payment, or give other lands, to any claimant who may be deprived of his possessions by operation of law; *nor shall the confirmations made by this act be so construed as to extend further than to a relinquishment, by the United States, of all interest in, and to, said lands,* nor to any lands occupied by the United States for military purposes.

"SEC. 4. And be it further enacted, That it shall be the duty of the register of the land office at Detroit, to issue patent certificates, in the forms usual in similar cases, *to claimants whose claims are confirmed by this act,* upon which certificates, if legally and properly obtained, patents shall be granted by the commissioner of the general land office." (Italics ours.)

It appeared that no patent was, however, issued to

this land until August 12, 1914—after this suit was brought—when a patent was issued to the "heirs of Joseph Pomerville and to their heirs and assigns forever."

One Joseph Campau, prior to 1843, purchased from different heirs of Joseph Pomerville, by different deeds, a total of an undivided eleven-fifteenth interest in the whole land. Daniel Corby, previous to that date purchased from another heir of Joseph Pomerville an undivided one-fifth interest in the whole land. The defendant heirs of Joseph Pomerville are the owners of the remaining one-fifteenth interest. It is the claim of the plaintiffs, and alleged in their bill, that in 1843 Joseph Campau and Daniel Corby had a division of their interest in private claim 11; that a line was drawn through the center of the farm; that Daniel Corby took the south half and Joseph Campau the north half; that a fence was built on the line; and that it had been the boundary line between the part of the private claim claimed by Corby and that part claimed and occupied by Joseph Campau and his heirs from that date unto this. On August 10, 1843, Daniel Corby conveyed the south part of private claim 11 and the north part of private claim 10, by warranty deed, to his son, Michael Timothy Corby, and on October 12, 1857, Daniel Corby, as guardian of Michael T. Corby, a minor, conveyed the south 65 acres of private claim 11 to David Cuddy by guardian's deed, in pursuance of an order of the probate court of Wayne county. David Cuddy on October 19, 1857, quitclaimed the same land to Stephen Corby, who, in 1879, mortgaged it as his own, and upon his death the south half of private claim 11 was inventoried as part of his estate and was assigned to his heirs-at-law.

It is plaintiffs' contention that since 1843 Daniel Corby and his heirs, by mesne conveyances and by inheritance, have been in the actual, visible, adverse,

notorious, continuous, exclusive and hostile possession of the south half. of private claim 11, and have cultivated it, paid taxes upon it, built fences upon it, and claimed to own it, as against all others who might claim any interest therein. The defendant Adele Campau Thompson claims an undivided eleven-fifteenth interest in said private claim 11, basing her claim upon the title derived by Joseph Campau from the heirs of Joseph Pomerville. It further appears that on June 9, 1910, Mrs. Thompson conveyed to Alfred Lucking and William Robbins by warranty deed a parcel of land described by metes and bounds containing 71.78 acres:

"Land in the township of Gratiot, county of Wayne and State of Michigan, described as a piece or parcel of land lying between the north line of P. C. 11 and fences on the south line of the property," etc.

The decree of the lower court gave the plaintiffs:

"The south 67.64 acres of private claim No. 11, being that portion of the private claim set off to Daniel Corby and occupied by him and his heirs since August 1, 1843."

All the defendants appeal and here contend that the plaintiffs cannot increase or enlarge their undivided one-fifth interest by adverse possession because of the following reasons, as stated in counsel's brief:

"(1) The legal title to the whole of private claim 11 was in the Federal government until after this suit was brought, and the complainants could not acquire a title against the government by adverse possession.

"(2) Daniel Corby having confessedly and knowingly entered into possession of the property as a tenant in common could not, under the facts in this case, acquire a title against his cotenants by adverse possession.

"(3) There is no evidence of adverse possession."

Counsel urge the well-recognized rule of law that no one can acquire title to government land by adverse

possession, no matter how long that possession has continued. No dispute need be had with reference to the general proposition thus stated. We have set forth, *supra*, parts of the act of congress of date April 17, 1828, which in our opinion by direct legislative act confirmed in the heirs of Joseph Pomerville the land which had been surveyed by the government and with reference to which the commissioners had reported favorably to a gift to these heirs. Of the power of congress to grant domain by direct legislation there can be no dispute, and, where this is done, no patent is necessary to pass the title, although a patent might be subsequently issued by the government, for the reasons stated in *Whitney* v. *Morrow,* 112 U. S. 693 (5 Sup. Ct. 333), where that court said:

"If, by a legislative declaration, a specific tract is confirmed to any one, his title is not strengthened by a subsequent patent from the government. That instrument may be of great service to him in proving his title, if contested, and the extent of his land, especially when proof of its boundaries would otherwise rest in the uncertain recollection of witnesses. It would thus be an instrument of quiet and security to him, but it could not add to the validity and completeness of the title confirmed by the act of congress. *Langdeau* v. *Hanes,* 21 Wall. (88 U. S.) 521; *Ryan* v. *Carter,* 93 U. S. 78; *Tripp* v. *Spring,* 5 Sawyer (U. S.) 209, 216 [Fed. Cas. No. 14,180]."

An examination of this record is convincing that there is abundant evidence of adverse possession on the part of the plaintiffs in this suit. The occupation of the land by the plaintiffs, the payment of the taxes, the transfer by warranty deeds, the leasing, inventorying and listing of this property as their own, were outward acts of exclusive ownership of an unequivocal character, overt, and notorious. David Trombly who lived on private claim 389, adjoining private claim 11, and who was 75 years of age, testified that he had lived there since 1841 and that the Corbys occupied the

south part of the claim as long as he could remember; that he was an assessing officer of the township; that the Corbys paid the taxes on the south part of the claim; and that the rest of the private claim was assessed to the Campaus. He also testified: "There was a line fence there as far back as I can remember." The Corbys personally occupied the land until about 1875, when it was rented by them from time to time by leases to Charles and Peter Madelein, who occupied it for twenty-four years.   Thomas W. Corby testified:

"There was a fence made there, but it was not all made by us.  Mr. Campau's tenant made part of it. There was about 40 rods of Mr. Campau's portion. Mr. Daniel J. Campau, father of this gentleman, drove down in back and looked down the line, and he ordered his men to go and cut new timber and put a fence there, and they did."

We are of the opinion that the rule that one cotenant cannot acquire title by adverse possession against the other cotenants has no application here. Granting that the ancestors of the parties hereto entered into possession of this land as tenants in common, we think that the character of the possession of the plaintiffs was of such a nature as to impart information and to give notice to the cotenants that adverse possession and actual disseisin were intended to be asserted against them.   The rule contended for, that one cotenant cannot obtain title by adverse possession against another cotenant, is not one of such general application that there can be no ouster of his cotenant by a tenant in common.   It is true, as stated by Mr. Freeman in his work on Cotenancy and Partition (section 221), that:

"From the peculiar and intimate connection existing between tenants in common of real estate, the proof of an ouster, by one or another of them, ought to be of the most satisfactory nature."

In the early case of *Campau* v. *Campau*, 44 Mich. 31 (5 N. W. 1062), it was said:

"The actual possession of a tenant in common will not be presumed as adverse to that of his cotenants, and his constructive possession in like manner will be limited to his interest as tenant in common. The possession of one tenant in common, unless under a claim of exclusive right, will not affect the rights of the cotenants. Such exclusive claim and denial of their rights should be clear and unambiguous and brought home to the knowledge of the cotenants either by express notice, or by implication. And if the latter, all doubt growing out of the nature and character thereof should be against an ouster. The presumption should be that the tenant in possession respects and recognizes the rights of his cotenants, until the contrary clearly appears; that the possession is rightful, and not to the exclusion of others having equal rights."

The continuous possession of a cotenant may, however, be of such a hostile character as to convert it into an ouster. With reference to this, Mr. Freeman says (section 242), quoting from decisions:

"If one tenant in common has been in possession a great number of years, without any accounting to his fellow commoners, this is proper evidence from which the jury may infer an adverse possession. In some instances, such possession has been regarded as raising a presumption of law which the jury are not at liberty to resist. An exclusive possession under a claim of title for 40 years, while the other cotenants resided in the same county and failed to assert any claim to their property, warrants the presumption of an actual ouster."

We find support for this conclusion in the decisions of our own court in *Fuller* v. *Swensberg*, 106 Mich. 305 (64 N. W. 463, 58 Am. St. Rep. 481), where it was said:

"Many of the authorities hold that an entry under a conveyance which purports to convey the entirety is equivalent to an express declaration on the part of the

grantee that he enters claiming the whole to himself, and is such a disseisin as sets the statute in motion in favor of the grantee. Freem. Coten. § 224; 11 Am. & Eng. Enc. Law, p. 1114. Other authorities hold that the statute does not begin to run until the cotenant has had notice or knowledge of the ouster. 3 Shars. & B. Lead. Cas. Real Prop. p. 121. But it is not necessary that actual notice be shown or brought home to the cotenant. It is said in *Packard* v. *Johnson*, 57 Cal. 180, that plaintiff was ousted from the point of time when he became aware of such claim, or (at the very least) from the time when, as a prudent man, reasonably attentive to his own interests, he ought to have known that his cotenant asserted an exclusive right to the land. Whichever rule is adopted, the full statutory period has run against complainants, for it must be conceded that before the expiration of the 15 years a prudent man, reasonably attentive to his own interests, ought to have discovered that defendants' grantors had asserted an exclusive right to this parcel of land."

See, also, *Brigham* v. *Reau*, 139 Mich. 256 (102 N. W. 845) ; *Payment* v. *Murphy*, 141 Mich. 626 (104 N. W. 1111). In *Dubois* v. *Campau*, 28 Mich. 304, Justice CAMPBELL said:

"The object of statutes of limitation would be defeated if a tenant in possession could be compelled to go back indefinitely and prove anything anterior to his uniform and exclusive possession during the statutory period. The law presumes that in that time evidence will probably be lost, or at least may be so, and that a party who has been entirely inactive during that period should have all the risk and burden thrown upon himself of proving what will overcome the defendant's right by possession."

In the case before us, the plaintiffs have been in exclusive possession of this land for a period upwards of 70 years. In fact, the division line between the two parts of the private claim seems to have been recognized by the defendant Mrs. Thompson by the deed to Lucking and Robbins. We think all the defendants

herein should be held to the rule that, as prudent persons reasonably attentive to their interests, they ought to have discovered that the plaintiffs and their grantors had asserted an exclusive right to this part of the land.

The point is also made that the bill does not allege exclusive possession. It did, however, allege "adverse possession," which in order to be adverse must contain all the elements, including exclusive possession, that go to make title by adverse possession. These, as we have said, are satisfactorily proven by the facts in this case.

The decree of the lower court should be, and hereby is, affirmed, with costs to the plaintiffs.

STONE, OSTRANDER, BIRD, MOORE, STEERE, BROOKE, and FELLOWS, JJ., concurred.