## WILD *v.* WILD.

1. EVIDENCE—ADMISSIONS OF DECEDENTS—CORROBORATION.
    Admissions of one long since deceased should be received with caution and are of little value without corroboration.

2. VENDOR AND PURCHASER — NOTICE — POSSESSION — CONSTRUCTIVE NOTICE.
    Possession by a land contract purchaser is constructive notice of his rights equal to constructive notice of record.

3. SPECIFIC PERFORMANCE—PAROL CONTRACT—LACHES.
    Sons of widow who quitclaimed interests in deceased father's real estate to her, allegedly, pursuant to parol contract of equal redistribution upon her death, are guilty of laches in waiting to seek specific performance thereof until after her death almost 12 years after her sale of property on land contract to one of the sons and over seven years after she had given him deed and taken mortgage back.

4. SAME—EVIDENCE.
    Evidence *held,* not only insufficient to establish alleged parol contract to redistribute land conveyed to widow by her sons, but to demonstrate it was not made.

5. EVIDENCE—CONTRACTS IN WRITING—PAROL EVIDENCE.
    Quitclaim deed, absolute in form, is so conclusively presumed to contain the entire contract of the parties reduced to writing thereby that parol evidence is inadmissible to contradict or add to its terms.

6. SPECIFIC PERFORMANCE — CONSIDERATION — PART PERFORMANCE — STATUTE OF FRAUDS.
    Equity will specifically perform contracts to leave property by will where they rest upon adequate consideration and are accompanied by such part performance as to take them out of the statute of frauds (3 Comp. Laws 1929, §§ 13411, 13415).

7. EVIDENCE—ADDITIONAL PAROL CONTRACTS—CONSIDERATION.
    Additional parol agreement omitted from written contract of the parties may not be added thereto under the guise of proving consideration.

8. EQUITY — CONTRACTS — SUPPORT OF RELATIVES — REPUDIATION — LACHES.

Sons of widow who were legally liable for her care, support and maintenance and who gave quitclaim deed of their interest in deceased father's estate on the understanding it was to be so used ought not to be permitted to repudiate such agreement where it had stood unquestioned 14 years.

9. EVIDENCE—TITLES BY DEED—FRAUD—MISTAKE.

Titles by deed ought not to be modified or overthrown by parol evidence in the absence of fraud or mistake.

NELSON SHARPE, C. J., and BUTZEL and EDWARD M. SHARPE, JJ., dissenting.

Appeal from Isabella; Hart (Ray.), J. Submitted January 4, 1934. (Docket No. 53, Calendar No. 37,540.) Decided April 3, 1934.

Bill by Herman Wild and others against Harry Wild and others to enforce a parol contract, to set aside conveyances and for other relief. Decree for plaintiffs. Defendants appeal. Reversed.

*O'Keefe & O'Keefe,* for plaintiffs.

*James E. Ryan* and *Virgil W. McClintic,* for defendants.

POTTER, J. Henry Wild was the owner of the property here in controversy when he died intestate in 1916. In November, 1916, all of his sons duly quitclaimed their interests in the real estate to their mother, Emma Wild. November 23, 1917, Emma Wild sold the land on land contract to Harry Wild, her son, who took possession of the same. January 5, 1922, the land contract having been partially paid up by Harry Wild, Emma Wild deeded the land to Harry Wild and took back from him and his wife a real estate mortgage of $2,500 and both the deed

and the mortgage were duly recorded. October 5, 1929, Emma Wild died, leaving a last will and testament which has been admitted to probate. Well-grounded suspicions that the real estate in controversy was in oil-producing territory developed about that time. In the spring of 1930, Harry Wild leased the land for oil purposes and received a bonus of $3,500 for executing the lease. September 6, 1930, the bill of complaint was filed herein to specifically enforce a parol contract alleged to have been made at the time the quitclaim deed was executed that Emma Wild at her death would leave the property equally to her sons. From a decree for plaintiffs, defendants appeal. All the testimony in the case consists of proof of alleged statements and admissions of Emma Wild, deceased. The case was tried long after her death. Her mouth was closed.

Proof of admissions is concededly the most unreliable known to the law. It should be received with caution and subjected to careful scrutiny as no class of evidence is more subject to error or abuse. Witnesses having the best motives are generally unable to state the exact language of an admission and are liable by the omission or the change of words to convey a false impression of the language used. No other class of testimony affords such tendencies or possibilities for unscrupulous witnesses to torture the facts or commit open perjury as it is often impossible to contradict their testimony at all or at least by any other witness than the party himself. 2 Jones, Commentaries on Evidence, § 295.

"*A fortiori* where the admission is that of one deceased the caution should deepen into suspicion for reasons that are obvious and without corroboration is of little value." 2 Jones, Commentaries on Evidence, § 295.

Emma Wild sold the real estate to Harry Wild November 23, 1917, on land contract. He took possession of the same. Possession by a land contract purchaser is constructive notice of his rights. *Corey v. Smalley,* 106 Mich. 257 (58 Am. St. Rep. 474); *Fraser v. Fleming,* 190 Mich. 238. Constructive notice by possession is equal to constructive notice by record. *Fraser v. Fleming, supra; American Cedar & Lumber Co. v. Gustin,* 236 Mich. 351. January 5, 1922, Emma Wild deeded the premises to Harry Wild and took back from him a real estate mortgage. Plaintiffs, by the express terms of the recording statutes, are charged with constructive notice, from the recording of the deed, of the rights of defendant Harry Wild (3 Comp. Laws 1929, § 13300).

By the land contract in question, the execution of the deed, and the acceptance of the real estate mortgage, Emma Wild had disabled herself from performing the contract mentioned and set forth in the bill of complaint. She had breached the contract made, if any such contract existed, and plaintiffs were guilty of laches in lying by and doing nothing until after death had closed her mouth against testifying in support of her and their deliberate acts. I am persuaded nothing ever would have been done by plaintiffs had it not been that this property came to be regarded as in productive oil territory and $3,500 was paid to Harry Wild as a bonus on an oil lease.

Emma Wild lived in Clare. She had no income outside the property which was left to her upon the death of her husband. The sons quitclaimed to her in November, 1916, their interests in the land. She lived approximately 13 years after such quitclaim deed was executed and delivered to her. Had she been without income her sons would have been

legally liable under the statute for her care, support and maintenance, if able to contribute thereto (2 Comp. Laws 1929, § 8208 *et seq.*). They quitclaimed their interest in the real estate to her undoubtedly with the expectation she would dispose of such property as she desired to dispose of to obtain the necessary funds with which to live. The testimony in support of the alleged contract is not only extremely meager and contradictory but demonstrates no such agreement as that alleged in the bill of complaint was made. Frank Holcomb, who was once a near neighbor, says he talked with Mrs. Wild about the time her husband died.

"*Q.* Just what did she say?
"*A.* That she made an agreement with the boys if she—if they would do it. *I don't know just how it was,* but, anyway, then to give her a life lease of it and when she was through with it she would divide it equally, equal share alike when she was gone."

Eva Richmond lived in Clare in the same house with Emma Wild. She says:

"She said she and the boys got together and agreed to sign this property over to her, and then at her death it was to be turned back to the boys in equal shares. * * * She didn't designate any particular property that was to come to the boys share and share alike, but all the property *except what she used for her own use during her life time.*"

Arthur Richmond, husband of Eva Richmond, was present at this conversation and he testified:

"All she told me was that the time her husband died they didn't have no will and she, *her and the boys got together and made an agreement and they all signed it* and she said she had the same as a life

lease she figured, and when she was dead and gone everything would be divided equally among the boys.''

Etta Snyder testified Mrs. Wild said:

''The boys came and signed off and it caused me no trouble, and I promised the boys *when I died then I would turn back, divide up what was left when I died*. That was all.''

Mrs. Leichti, who had lived neighbor to Mrs. Wild, testified that Mrs. Wild never said anything about the boys having deeded the property but she did tell witness that she had just made the first will.

''*Q*. What was it she said about the will, what provisions she had made in the will with reference to the papers?
''*A*. Well, nothing, only she said at the time of her death she was going to divide the property equally amongst the boys. That is all.''

This is the substance of all the testimony introduced by plaintiffs.

Analyzing this testimony it appears the witness Frank Holcomb did not know just how it was. It is apparent from his testimony he had no clear conception of any arrangement. He had been interviewed by Mr. Johnston, engaged in oil operation or promotion. This witness thought a life lease was involved. If a life lease was involved, title to the real estate was already in the boys subject to such life lease and it would be wholly unnecessary for her to divide the property share and share alike upon her death. It was theirs in equal shares anyway. Eva Richmond, who lived in the same house with Mrs. Wild, said all the property was to go back to the boys except what Mrs. Wild used for her own

use during her lifetime. If there was such an understanding as is indicated by the testimony of Eva Richmond, Mrs. Wild took absolute title to the property. She had a deed, absolute in form, which quitclaimed all of the interests of all of the boys in the real estate and according to this witness she had a right to sell and dispose of this real estate and use the proceeds to be derived therefrom for her own use during her lifetime. This testimony can be consistent only with the fact the title transferred by the boys to Mrs. Wild was absolute and Mrs. Wild had a right to do with the property whatever she saw fit during her lifetime. Arthur Richmond, the husband of Eva Richmond, present at the same time, heard the same conversations, and directly disputes the testimony of Eva Richmond because he testifies what nobody else claims, that Mrs. Wild and the boys got together after the death of her husband and made an agreement and they all signed it. This was obviously untrue. Etta Snyder's testimony indicates Mrs. Wild made some statement indicating that at her death she was going to divide up what was left and to that extent corroborates the testimony of Eva Richmond who testifies Mrs. Wild said the boys were going to receive the property except what she used for her own use during her lifetime. The testimony of these witnesses indicates that by the quitclaim deed Mrs. Wild received an absolute title with full power and authority to dispose of the real estate quitclaimed for her own use and benefit. Mrs. Leichti knew nothing about the quitclaim deed and only testified that Mrs. Wild had made some statement to the effect that she was going to divide her property equally among her boys at the time of her death.

The quitclaim deed was absolute in form. It is presumed to contain the agreement made by the par-

ties at the time. When the parties to a contract or agreement deliberately reduce it to writing, executed with the formalities of a deed, it is so conclusively presumed to embody the whole contract that parol evidence is inadmissible to contradict it or add to its terms. If such an agreement as is alleged was talked of when the quitclaim deed was made, and the testimony clearly shows there was no such talk, why was it not incorporated in writing? Though equity will specifically enforce a parol contract to leave property by will, such contracts must rest upon an adequate consideration and be accompanied by such part performance as to take them out of the statute of frauds (3 Comp. Laws 1929, §§ 13411, 13415). As said by this court:

"The contract or agreement sought to be enforced must be mutual and the tie reciprocal. It must be certain in all essential particulars. There must be acts of part performance unequivocally referring to and resulting from the agreement. The agreement set up in the bill of complaint must appear to be the one claimed to have been performed." *Woods* v. *Johnson, ante,* 172.

An additional parol agreement omitted from the executed writing, existing prior to or contemporaneous with that embodied in the writing, may not, under the guise of proving consideration, be added to the writing itself.

The quitclaim deed, the deliberate act of plaintiffs, based upon ample and adequate consideration, which stood unquestioned for 14 years ought to continue to stand. Plaintiffs who understood the property in question was deeded to Emma Wild to be used by Emma Wild to pay her expenses ought not to be permitted to repudiate that understanding and agreement.

Plaintiffs ought not to be permitted to question the acts of Emma Wild after having lain by so long a time without doing so. Titles by deed ought not to be modified or overthrown by parol evidence in the absence of fraud or mistake. The testimony of plaintiffs, when construed together, shows no such contract as that claimed and found was ever made. Title to real estate ought not to be disturbed by such uncertain, contradictory and wholly unsatisfactory evidence as that introduced here. From the record, from what the parties did, from the quitclaim in proper form to Mrs. Wild, from her sale of the property under the land contract to Harry Wild, from the payments made by him through the bank at Clare, from the fact the land was sold by Emma Wild to Harry Wild under land contract as early as November 23, 1917, 13 years before suit was commenced, and the property was deeded by Emma Wild to Harry Wild, and a real estate mortgage taken back January 5, 1922, eight years before the commencement of suit, that there never would have been any litigation had it not been for the voluntary interference of Mr. Johnston, after Harry Wild had obtained the $3,500 bonus for executing an oil lease, seems clear.

The decree of the trial court is reversed and the bill dismissed, with costs.

North, Fead, Wiest, and Bushnell, JJ., concurred with Potter, J.

Nelson Sharpe, C. J. (*dissenting*). Henry Wild, a resident of the county of Isabella, died intestate in the fall of 1916, leaving as his heirs his widow, Emma Wild, and his sons Herman, Frank and William, the plaintiffs, and Harry, one of the defendants herein. The deceased owned at the time of his

death 75 acres of land in the county of Isabella, three lots in the city of Clare, and considerable personal property. On September 27, 1915, he and his wife had entered into a contract for the sale of 120 acres of land in said county to Harry L. Cummings for the sum of $6,000, of which $400 had been then paid. This contract was also a part of his estate.

On the 1st day of November, 1916, his four sons, as heirs of the deceased, by quitclaim deed, "in consideration of the sum of one dollar and other considerations to them in hand paid," conveyed to their mother, Emma Wild, the widow of the deceased, the real estate above referred to, particularly describing the same, and also all their title and interest in the personal property owned by the deceased or in which he had any interest.

On October 5, 1929, Emma Wild died, leaving a last will and testament, executed on September 4, 1929, in which she devised and bequeathed to her son Herman the sum of five dollars, to her son Frank the sum of $1,000, and to her son William two lots in the city of Clare. Some bequests were made to other relatives, and the residue of her estate was devised and bequeathed to her son Harry. The will was duly admitted to probate. The defendant Francis H. Dodds was appointed executor therein, and he duly qualified and is acting as such.

On September 6, 1930, the plaintiffs filed the bill of complaint herein, in which they alleged that, at the time the quitclaim deed, above referred to, was executed, their mother, Emma Wild, entered into an agreement with her four sons that, in consideration for their conveyance of their interest in their father's estate to her, she would, by her last will and testament, devise and bequeath to them, share and share alike, all of the real property so conveyed to

her, and that she would not sell or incumber the same; that such agreement was fully performed on their part by the execution of the said quitclaim deed, and that on her death they became entitled to an undivided three-fourths interest therein. In their prayer for relief they ask that the defendants do execute conveyances of the same to them, and that, in default thereof, the decree of the court do so provide.

The answer of the defendants contained a denial of the allegations in the bill relative to the agreement on the part of the mother and that plaintiffs were entitled to the relief prayed for. From a decree granting such relief the defendants have taken this appeal.

1. *Jurisdiction.* Counsel for the defendants, at the conclusion of plaintiffs' opening statement, and again when plaintiffs' proofs had been submitted, moved to dismiss the bill upon the ground that the probate court, having assumed jurisdiction over the estate of Emma Wild by admitting her will to probate, had exclusive jurisdiction to hear and determine the matters alleged in the bill of complaint. In this suit, in equity, the plaintiffs in no way attack the probate of the will or the right of the executor to function thereunder. It is their claim that the deceased failed and neglected to do something which she in her lifetime had contracted to do, and specific performance on the part of her executor and others now interested in the property is sought. Of this the probate court had no jurisdiction. See, *Carmichael* v. *Carmichael,* 72 Mich. 76 (1 L. R. A. 596, 16 Am. St. Rep. 528); *Kundinger* v. *Kundinger,* 150 Mich. 630; *Outland* v. *Outland,* 237 Mich. 122; *Burgess* v. *Jackson Circuit Judge,* 249 Mich. 558; *Smith* v. *Thompson,* 250 Mich. 302 (73 A. L. R. 1389).

The case of *Tipson* v. *Jeannot,* 204 Mich. 403, on
which the defendants principally rely, is easily
distinguishable. In that case, an agreement under
which a husband agreed to pay his wife a specific
sum for her support and maintenance was involved,
and it was held that, as the validity of the agree-
ment was not questioned, the rights of the wife
thereunder might be determined in the probate court
in the settlement of the husband's estate.

2. *Was the contract established?* In an opinion
filed by the trial court, he reviewed the evidence at
some length and found that the agreement between
the mother and her sons was entered into at the time
the quitclaim deed was executed, and in considera-
tion thereof. While specific performance is discre-
tionary and will be granted only when a complain-
ing party is clearly entitled thereto (*Harmon* v.
*Muirhead,* 247 Mich. 614), the testimony of a num-
ber of apparently disinterested witnesses that the
mother had stated to them that she had so agreed
satisfies us, also that the agreement was made as
claimed, notwithstanding the fact that her dealings
with the defendant Harry Wild, hereafter referred
to, may cast a doubt thereon. See, *Burnham* v. *First
National Bank,* 264 Mich. 547.

3. *Interest of Johnston.* Defendants alleged in
their answer that this suit had been instigated, and
was being maintained and financed, by Edmund E.
Johnston under an agreement with plaintiffs to con-
vey to him certain interests in the oil, gas and min-
erals that might be produced from the property,
and that such agreement was against public policy
and void, and that by reason thereof the bill should
be dismissed. The trial court found that:

"No competent evidence was introduced to sub-
stantiate any claim that Johnston either induced

plaintiffs in this action or that he had any interest in the litigation whatever.''

With this finding we are in accord.

4. *Relief granted.* On November 23, 1917, the mother, Emma Wild, entered into a land contract for the sale of the 75 acres to the defendant Harry Wild. The purchase price was stated therein to be the sum of $4,250, of which $1,000 was payable on or before March 1, 1918, and the balance as therein provided. On January 5, 1922, she executed a deed of the land to him pursuant to the terms of the contract, and on the same day he executed a mortgage thereon to her for $2,500, which was recorded with the deed. In the spring of 1930 he leased this land to an oil company, and received as a bonus therefor the sum of $3,500.

The trial court found that, as Harry was a party to the agreement above referred to, ''his plan and design was to defraud his brothers and deprive them of the property that was to go to each of them at the death of the mother,'' and that—''no accounting should be had on the claim that a reasonable value of the land at the time he obtained the same was paid to his mother by him.'' In the decree he set aside the land contract and deed, and ordered Harry and his wife to convey to the plaintiffs an undivided three-fourths interest therein. He also found that Harry had no authority to execute the oil and gas lease, and that the plaintiffs were entitled to three-fourths of the bonus and annual rentals received therefor.

Counsel for the defendants insist that there is no testimony to sustain the finding of the court that Harry's action in securing the contract and deed was fraudulent. If the agreement on the part of the mother be sustained, as we find it should be,

Harry had no right under the facts here presented
to purchase this property which she had obligated
herself to leave to her four sons at her death. It
was his duty to exercise the utmost good faith to-
wards his brothers in his dealings with his mother
in relation thereto, and under the circumstances he
acquired no interest therein by his purchase other
than that to which he was entitled under the agree-
ment made when the property was quitclaimed to
her.

As already stated, the deceased and his wife had
entered into a contract for the sale of 120 acres of
land to Harry L. Cummings for the sum of $6,000.
On October 20, 1919, the assignee of Cummings as-
signed his interest in this contract to Henry S. G.
House, and on October 19, 1920, House assigned his
interest therein to the defendant Harry Wild. The
trial court found that there was due and unpaid on
this contract on April 1, 1933, the sum of $4,445.42,
and that plaintiffs were entitled to a three-fourths
interest therein.

It appears, as before stated, that at the time
Harry received a deed of the 75 acres from his
mother he executed a mortgage to her thereon for
$2,500, on which $500 has been paid; $2,000 of this
loan had been used by him in his purchase of the
land contract from House. Having thus received
credit on the contract for this sum, the court decreed
that he should pay to plaintiffs three-fourths of the
$2,000 remaining unpaid on the mortgage.

Counsel for the defendants strenuously object to
these last two allowances for the reason that no
claim therefor was made in the bill of complaint or
in the relief prayed for. The plaintiffs asked for
such further relief as equity required. They were
not chargeable with knowledge of all of the trans-

actions had between Harry and his mother. Having found that the contract between the mother and her sons was made, the court by its decree sought to protect the plaintiffs from loss due to the fraudulent conduct of their brother in inducing their mother to violate the agreement, and it had jurisdiction to fully adjust the rights of the parties in the property left by the husband, the title to which passed to his wife under the quitclaim deed.

While the conclusions reached by the trial court and embodied in its decree may work an injustice to Harry, we are impressed that on the record before us they were warranted and that they but secure to plaintiffs that to which they would have been entitled had the ownership of the property of the father remained in the mother at the time of her decease.

The decree should be affirmed, with costs to appellees.

BUTZEL and EDWARD M. SHARPE, JJ., concurred with NELSON SHARPE, C. J.