HOPE *v.* DETROIT TRUST CO.

*In re* THOMPSON'S ESTATE.

APPEAL OF HOPE.

1. EVIDENCE—ADMISSIONS—DECEDENTS—CORROBORATION.

Proof of admissions is the most unreliable known to the law, should be received with caution, and subjected to careful scrutiny and when alleged admission is that of one deceased the caution should deepen into suspicion and is of little value without corroboration.

2. EQUITY—STALE DEMANDS—ACQUIESCENCE.

Equity will not aid one seeking to recover a stale demand where plaintiff has slept upon his rights and acquiesced a great length of time.

3. SAME—LACHES—DILIGENCE.

Time alone is not the essence of laches but diligence is required of those seeking equitable relief.

4. SAME—PARTITION—LACHES—EVIDENCE.

Decree denying partition to descendants in fifth generation from owner of undivided interest in real estate, held by family, *held,* justified under evidence showing, among other things, unusual amount of litigation between members of the family and extensive real estate operations.

Appeals from Wayne; Campbell (Allan), J. Submitted January 21, 1936. (Docket Nos. 12, 13, Calendar Nos. 38,661, 38,662.) Decided April 6, 1936.

Bill by Ernestine Hope and others against Detroit Trust Company, trustee, for partition of lands, accounting and other relief. St. Vincent's Orphan Asylum, a Michigan corporation, intervened as party defendant. In the matter of the estate of Adele Campau Thompson, deceased, claims of Er-

nestine Hope and others were denied. Claimants appealed to circuit court. Cases consolidated for trial and appeal. Decree for defendants. Judgment for estate. Plaintiffs and claimants appeal. Affirmed.

*Lucking, VanAuken & Sprague* and *William M. Mertz,* for plaintiffs.

*Atkinson, Ortman & Watson,* for plaintiff Estate of James LaCroix, deceased.

*Frank W. Atkinson, Harold Hanlon* and *LeRoy C. Lyon,* of counsel, for plaintiffs.

*Beaumont, Smith & Harris, Frank C. Cook* and *John P. O'Hara (Roy H. Curtiss,* of counsel), for defendants.

Bushnell, J. The bill of complaint herein avers that plaintiff Ernestine Hope, and 76 others, as descendants and heirs at law of Jacques Campau of Wayne county, who died in 1838, are the owners in fee simple, as tenants in common, of a portion of Private Claim 322 in interests, varying from an undivided 1/6048th to a 1/72d each with Daniel J. Campau, Jr., who owned or claimed to own at the time of his death, in 1927, all of the remaining undivided interest therein. Defendant, Detroit Trust Company, is the testamentary trustee of Adele Campau Thompson, deceased, the sister of Daniel, Jr., and intervening defendant St. Vincent's Orphan Asylum is a residuary legatee under the last will and testament of Adele Campau Thompson, deceased.

Two causes are combined in the one record before us—an appeal from a decree in chancery denying plaintiffs a partition of the remaining unsold

lands in Private Claim 322 and an accounting as to the proceeds of the sale of lands; the other an appeal from a judgment disallowing the claims of the same parties against the Thompson estate. By written stipulation the testimony taken and the exhibits received in the chancery cause were considered to be the record in the law appeal from the probate court.

Private Claim 322, now in the city of Detroit, is said to contain 366.92 acres of land and is located east of Connors avenue which is about five miles east of Woodward avenue. It extends from the Detroit river on the south to Harper avenue (formerly Derasse road) on the north. Jefferson avenue, Kercheval avenue (formerly Laferte road) and Mack avenue (formerly Clinton road) divide the claim into three parcels. Located within this private claim are the manufacturing plants of the Hudson Motor Company, Continental Motors and others, 69.16 acres of Chandler park, and the homes of approximately 6,500 people.

The title to the first concession of Private Claim 322 is evidenced by a United States patent issued to Nicholas Campau in 1811 and the second concession by a patent to his heirs in 1840. Nicholas died intestate in 1811 and Jacques, one of his brothers, thereby inherited an undivided 1/7th which became an undivided 1/6th in 1818 when Dennis, another brother, died unmarried and intestate. The other undivided 1/6th each were owned by Catherine, a sister, the children of Cecille, a deceased sister, Barnabas, Louis and Joseph, who were brothers. Daniel J. Campau, Jr., out of whose dealings with the land the present controversy arose, was the son of Daniel J. Campau, Sr., who was the son of Joseph, the brother of Jacques.

The lands of the Campau family have been a fruitful source of litigation since the Nicholas Campau patent of 1811, various phases of which will be found in the following reported cases: *Campau* v. *Campau*, 19 Mich. 116; *Campau* v. *Campau*, 37 Mich. 245; *Campau* v. *Lafferty*, 43 Mich. 429; *Campau* v. *Campau*, 44 Mich. 31; *Campau* v. *Campau*, 45 Mich. 367; *Campau* v. *Lafferty*, 50 Mich. 114; *Corby* v. *Thompson*, 196 Mich. 706, and in many unappealed cases in the files of the circuit court for the county of Wayne. The diligence of counsel has been unable to disclose any written instruments whereby Jacques Campau ever conveyed his undivided 1/6th interest. The trial court found that although during the period of 123 years from the original title to that claimed by defendants, there had been many deeds, judgments and decrees affecting it, nowhere in the records is found any litigation or any conveyances that would operate to extinguish the share of Jacques Campau in the estate of his bachelor brother Nicholas.

The trial judge in his opinion carefully traced the history of the title, and discussed the probate court records of the estate of various members of the Campau family. We quote the following from the court's observation of litigation affecting this title:

"The Campau family seemed to have been quite willing to resort to litigation, inasmuch as the property in question here has been the subject of eight lawsuits, of which six were appealed to the Supreme Court. In addition thereto, properties belonging to the various Campau heirs, appear to have been litigated in five cases reported in the Supreme Court. The first litigation appears in 1865, a partition suit brought by one of the sons of Joseph Campau against his brother, and other heirs for partition. Both sides to that litigation were agreed that the

interest of the heirs of Joseph Campau were two-sixths, plus one-fourth of one-sixth of Private Claim 322. Other litigation and conveyances among the heirs of Joseph Campau continue to refer to the family property as consisting of this same amount. The inventory of Joseph Campau's estate contains this same limitation on his interest in Private Claim 322.

"For some reason, impossible to understand now, Jacques Campau never claimed any interest in this property. No probate file of any ancestor of the plaintiffs' inventories any claim or interest in this property from the time of Nicholas Campau to the present. The reason for this silence and acquiescence in the control and disposition of the property by the Joseph Campau branch of the family cannot be explained. It is so far lost that the patient industry of counsel on both sides has not succeeded in clearing up the mystery."

The court found it to be the fact that:

"Jacques Campau died in 1838, leaving two children, Sophia Dubois, and James Campau, as his heirs. Mrs. Dubois left three children surviving her. James Campau left six children. The first named plaintiff here, Ernestine Hope, was the great-granddaughter of James Campau, and the great-great-granddaughter of Jacques Campau. In other words, she is of the fifth generation from Jacques Campau. Joseph Campau (brother of Jacques) did not die until 1863. His heir, in whom vested the title to Private Claim 322, was Daniel J. Campau. Upon the death of Daniel J. Campau, his three children exchanged conveyances, so that Daniel J. Campau, Jr., succeeded to all the title his father had. This family adjustment occurred on July 1, 1897. From that date to the death of Daniel J. Campau, Jr., in 1927, this property was treated as the sole and undisputed property of Daniel J. Campau, Jr."

The first definite assertion of a claim of title to the entire property by the heirs of Joseph Campau, excepting that established in the heirs of Barnabas, a brother of Jacques, seems, according to the court's opinion, to have been in the final decree of partition entered in 1886. From this time Daniel J. Campau, Jr., and his brother and sister, exercised their undivided ownership in all the property set out to them by the partition decree, without recognizing any joint interest, either in the heirs of Jacques or of his brother Louis.

In 1894, Daniel J. Campau, Jr., deeded a part of the land to a racing association on which a race track was constructed and used for many years. In 1903, he was described as the sole owner of these lands in condemnation proceedings for the opening of Kercheval avenue, and the widening and straightening of Jefferson avenue. In 1905, he mortgaged the property for $75,000 and later sold 43 acres to the Hudson Motor Company; portions were platted by him at various times, that between Charlevoix and Kercheval avenues in 1913, between Charlevoix and Mack avenues in 1916, and north of Mack in 1920. He generally dealt with the land as if it were his own, without let or hindrance from anyone. After his death in 1927, his estate was inventoried at $5,853,108.87. No claim, however, was filed therein by any of the plaintiffs nor did they indicate in any manner that a part of the moneys and property of the estate belonged to them. His sister, who was his residuary devisee and legatee, and his wife both died later, having conveyed their interest in Daniel's estate to Detroit Trust Company as trustee. Their residuary legatees are the intervening defendant St. Vincent's Orphan Asylum, the Little Sisters of the Poor, the Academy of the Sacred Heart of Grosse Pointe and the Uni-

versity of Detroit. The bill of complaint herein, filed July 21, 1931, is the first claim made to the property or its proceeds by any of the heirs of Jacques Campau in the nearly 100 years following his death, except as disclosed by the testimony taken in this cause.

Claiming as tenants in common with Daniel, Jr., and his heirs, appellants' long-continued silence and acquiescence in his manifold dealings with the property are only explained by the testimony of Freda McBride. She was Daniel J. Campau's private secretary and cashier from August, 1914, until her marriage some 10 years later, during which time she became familiar with his business affairs. She told of the visits of his cousin, Thomas Campau, Jr., to Daniel's office two or three times a year and that she overheard conversations between them. We quote from her direct testimony:

"*Q.* Now, will you tell us, taking up first the conversation that you heard between Daniel Campau, Jr., and Thomas Campau, Jr., tell us what Mr. Daniel Campau, Jr., said and what Mr. Thomas Campau, Jr., said?

"*A.* Well, they were in the office and Mr. Campau spoke low, and Tom Campau asked him when he was going to settle up and pay out the heirs what was coming to them, to the grandfather Nicholas' farm, for the sale of the grandfather Nicholas' farm.

"*Q.* What did Mr. Daniel J. Campau say?

"*A.* Mr. Campau always said he should leave it in his hands; that he could sell it at a better advantage, and as soon as the property was sold, that he would give the heirs their share.

"*Q.* Now, you say that that conversation occurred during the first two months of your employment in Mr. Campau's office?

"*A.* Yes, sir.

"*Q.* Was that same topic discussed between the two Campaus, at any time after this conversation that you have told us about?

"*A.* Yes, sir, it was.

"*Q.* Will you tell us approximately how many times?

"*A.* Oh, about two or three times every year."

Thomas, Jr., died about 1920 and Mrs. McBride testified that he was in the office about 15 times during the preceding five years.

A Mrs. Zelch, another cousin who lived in Romeo, and who is now deceased, came in, according to Mrs. McBride, about a half-dozen times.

"She said about the same thing Tom Campau said, she was after her share of the grandfather Nicholas' farm. She wanted to know when he was going to clear it up and he told them, always told them the same thing, that he was working on it now, and that he could sell the property at a better advantage if they left it in his hands, and as soon as he sold it he would see that she and the rest of the heirs would get their portion."

The witness also overheard a conversation between Daniel, Jr., and his attorney George William Moore, now deceased, following the protest of some lot buyers about the condition of their title. In response to their demands:

"Mr. Campau said that they should not pay any attention to it, that that property was all right, that he had always intended to get it cleared up so he could give a clear title to any of the property that was sold, and as soon as he could do that, he would have to pay off the different heirs on that Private Claim 322, before he could give the clear deed or clear title to the property. * * *

"*Q.* What did Mr. Campau say to Mr. Moore?

"*A.* Mr. Campau said he wanted to get that title cleared up, that he was to make him out a list of

all the heirs and the amounts that were due to them, and he dictated to Mr. Moore's stenographer just what he wanted done.''

With respect to another lot buyer's protest, she testified:

.''In trying to resell his lot, he was unable to do so on account of the title not being clear, and Mr. Campau said it was his aim all his life—I remember distinctly that he said that to George William Moore, and also to Mrs. Zelch, and to Tom Campau,—he said, 'It has been my aim all my life to give the heirs their share that is coming to them and clear up the title on Private Claim 322.' ''

We again quote a portion of the opinion of the trial judge:

''Plaintiffs seek to avoid the obvious defense of adverse possession by reason of the fact that they derive their title from one who was in his life time a joint tenant with the ancestor of Daniel J. Campau. While at one time it seemed rather uncertain as to whether or not a cotenant could assert the defense of adverse possession, the law is now well settled that such a defense is available to a cotenant, although the proof to establish the same is required to be 'clear and cogent.' See: *Yelverton* v. *Steele,* 40 Mich. 538; *Donohue* v. *Vosper,* 189 Mich. 78, 90; *Keyzer* v. *Peterson,* 206 Mich. 238. \* \* \*

''If the defense of adverse possession were not open, the defense of laches is sufficient to defeat the plaintiffs' claim. Mere lapse of time does not constitute laches. Here we have at least four generations showing no interest in the property until, after its character has changed from that of a frontier farm to an exceedingly valuable and thickly populated portion of a great city. During all this time taxes have been paid, and the property managed by the defendants' predecessors in title. Evidence which might have been available had this case

been brought 40 or 50 years ago, is now lost in obscurity. No explanation is offered on the part of the plaintiffs which would operate to excuse this long period of inactivity. This principle is well illustrated in the case of *Campau* v. *Chene,* 1 Mich. 400. In that case the heirs of Campau brought suit against the heirs of Chene to set aside a deed, given in the year 1800. The deed contained certain conditions which were not fulfilled. The alleged breach was committed in 1800, and Chene occupied the premises until 1831, when his heirs took possession. Campau died in 1819. Suit was commenced in 1847. The court said:

" 'A court of equity, which is ever active in relief against conscience or public convenience has always refused its aid to stale demands, where the party has slept upon its rights, and acquiesced a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence; where these are wanting, the court is passive, and does nothing. * * * In the present case Campau lived 19 years after the alleged breached condition, and the litigation is now between heirs in the second degree.'

"A third reason is suggested why the plaintiffs are not entitled to relief in this court, growing out of the fact that Daniel J. Campau, Jr.'s, estate has been fully administered and closed. On January 3, 1930, the final account of the executors of Daniel J. Campau, deceased, was submitted to the probate court, and thereafter allowed. Commissioners on claims had been fully appointed, and no suggestion of any right to an accounting was made before these commissioners.

"The particular type of claim here presented does not seem to be one ordinarily cognizable by commissioners on claims. Had the aid of a court of chancery been invoked during the time that the estate was in process of settlement, an appropriate notice could have been filed with the executors and with the commissioners on claims to the effect that the estate could not be administered and closed until the rights of the plaintiffs had been adjudicated. No such notice was ever given, and it therefore seems to the

court that this bill is filed too late. Inheritance taxes have been paid, and the title to the property of the estate is now vested in other hands.. To permit such a practice as this would destroy the finality which our law has given to probate orders and decrees. It seems, therefore, for this reason, also, plaintiffs are not entitled to a decree.''

The trial court denied plaintiffs any relief, dismissed their bill, denied their claim in the Thompson estate and quieted title to the property described in the bill of complaint in Detroit Trust Company, as executor of the estate of Adele Campau Thompson.

In a written opinion denying a motion for rehearing the trial judge again reviewed the testimony of Mrs. McBride and stated that Thomas Campau, Jr., who surveyed property for his cousin and others, knew better than anyone else the exclusive nature of Daniel Campau's management, yet he was content to remain silent except on occasional visits to his cousin. The court also called attention to the absence of proof that any of the plaintiffs relied upon Daniel's assurances and pointed out that the persons to whom the assurances were claimed to be given were dead as well as the person who made the statements.

While the question of adverse possession may be important, the lack of diligence on the part of those seeking the aid of a court of equity is still more persuasive. The only explanation of their continued acquiescence in Daniel's conduct is that found in the testimony of Mrs. McBride. We think the reasoning of *Wild* v. *Wild,* 266 Mich. 570, is sufficient and controlling. We said:

''All the testimony in the case consists of proof of alleged statements and admissions of Emma

Wild, deceased. The case was tried long after her death. Her mouth is closed.

"Proof of admissions is concededly the most unreliable known to the law. It should be received with caution and subjected to careful scrutiny as no class of evidence is more subject to error or abuse. Witnesses having the best motives are generally unable to state the exact language of an admission and are liable by the omission or the change of words to convey a false impression of the language used. No other class of testimony affords such tendencies or possibilities for unscrupulous witnesses to torture the facts or commit open perjury as it is often impossible to contradict their testimony at all or at least by any other witness than the party himself. 2 Jones, Commentaries on Evidence, § 295.

" '*A fortiori* where the admission is that of one deceased the caution should deepen into suspicion for reasons that are obvious and without corroboration is of little value.' 2 Jones, Commentaries on Evidence, § 295."

In an action by those who claimed to be tenants in common to set aside deeds and to compel partition and accounting, this court said:

" 'Equity aids the vigilant; not those who slumber on their rights.'

"This rule is designed to promote diligence on the part of suitors; to discourage laches, by making it a bar to relief; and to prevent the enforcement of stale demands of all kinds, wholly independent of the statutory periods of limitation. 1 Pomeroy's Equity Jurisprudence (1st Ed.), § 418. The rule is well stated by Lord Camden in *Smith* v. *Clay,* 3 Brown, Ch. 639 (29 Eng. Rep. 743):

" 'A court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his right, and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence.' " *Douglass* v. *Douglass,* 72 Mich. 86, 98.

While time alone is not the essence of laches and every case of this nature must be determined upon its own facts, nevertheless, diligence is certainly required of those seeking equitable relief. We are not favorably impressed with the explanation as to why no steps were taken to enforce the alleged rights of these plaintiffs or their ancestors, either during the extensive real estate operations of Daniel J. Campau, Jr., or when their attention must have been challenged by the unusual amount of litigation over the title to properties in this Private Claim 322 between other members of the same family.

"This case forcibly illustrates the wisdom of the law which requires diligence on the part of those who seek equitable relief." *Mogk* v. *Stroecker*, 243 Mich. 668.

We think the trial court made a just disposition of the matter.

The decree and judgment are affirmed, with costs to appellees.

North, C. J., and Fead, Wiest, Butzel, Edward M. Sharpe, Potter, and Toy, JJ., concurred.