THE KAISERIN MARIA THERESA.

(Circuit Court of Appeals, Second Circuit. November 7, 1906.)

No. 28.

1. COLLISION — SCHOONER OVERTAKEN BY STEAMSHIP — FAILURE TO EXHIBIT STERN LIGHT.

A finding affirmed that a schooner was in fault for a collision with an overtaking steamship at night because of her failure to exhibit a white light or flare-up astern, as required by article 10 of the International Navigation Rules (Act Aug. 19, 1890, c. 802, § 1, 26 Stat. 320 [U. S. Comp. St. 1901, p. 2866]), on evidence which showed that while she had a torch, it was not in condition for use for lack of oil, so that when its use was attempted it quickly blew out.

[Ed. Note.—Overtaking vessels, see note to The Rebecca, 60 C. C. A. 254.]

2. SAME—EXCESSIVE SPEED.

A steamship is not required to maintain a speed so low as to enable her to avoid collision with other vessels which are navigating without displaying proper lights.

3. SAME—REMOVAL OF LOOKOUTS FROM STATIONS—DUTY TO REDUCE SPEED.

A steamship, navigating the Atlantic on a dark but clear night, which was obliged by the coldness of the weather and the freezing of the spray to remove the lookouts from their proper places forward to the bridge, but which kept a good lookout from there, cannot be held in fault for a collision with a schooner which she overtook, and which exhibited no stern light, because she did not reduce her speed so as to enable her to avoid the collision after coming near enough to make out the schooner.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal from a decree of the District Court, Southern District of New York, which held both vessels in fault for a collision between the schooner Pavia and the S. S. Kaiserin Maria Theresa. The collision took place about 4:30 a. m., January 4, 1901, on the Atlantic Ocean, about two days' journey from the port of New York, both vessels were westward bound, the steamer overtaking the schooner.

E. E. Blodgett, for libelants.

Jos. Larocque, Jr., for claimant.

For opinion below, see 125 Fed. 145.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

149 F.—7

LACOMBE, Circuit Judge.  It is conceded that the schooner did not show from her stern the fixed white light, required by article 10, International Rules (Act Aug. 19, 1890, c. 802, § 1, 26 Stat. 320 [U. S. Comp. St. 1901, p. 2866]), but her contention is that she showed a flare-up light, which the article permits as an alternative when no fixed light is carried.  The District Judge found that she "failed to properly exhibit a flare-up light.  She had a torch aboard, but it was not in a condition to use for lack of oil, so that when it was lighted and attempts made on two occasions to exhibit it to the steamship it quickly went out, and, in effect, she exhibited no light astern."

The evidence fully sustains this finding.  There were four persons on the bridge of the steamer, an experienced seaman stationed at each end (port and starboard) and the navigating and watch officers (first and fourth officers) respectively, on the port and starboard sides.  None of them, although they were keeping a careful lookout ahead, saw any light on the schooner, the first indication of her proximity being the looming up through the darkness of her masts about half a point on the starboard bow, a short distance ahead.  Of the weight to be given to such testimony we have written on former occasions.  Sewall v. La Champagne (D. C.) 53 Fed. 398; Gurney v. The John H. Starin, 122 Fed. 236, 58 C. C. A. 600; The Helen G. Moseley, 63 C. C. A. 144, 128 Fed. 402.  The evidence from the schooner is unpersuasive.  She carried an eight-wick torch, but the single sailorman who was on watch did not know where it was kept, and after sighting the steamer had to go forward to inquire for it, then back to the cabin to get it, then forward again to have it lit in the sheltered forecastle; there was a very heavy blow—almost a gale.  An effort to light it with matches failed, so it was thrust into the stove to secure ignition.  When lit the watch carried it to a raised place amidships, and waved it above his head; it went out, and he returned to the forecastle.  Those below then poured some oil from a can into a pail and thrust the torch into it, apparently expecting that the wicks would absorb enough oil to burn.  It was again lit in the stove, again given to the watch, and when he waved it, it again went out.  While those in the forecastle were trying to light it the third time, the collision took place.  How long on each occasion the torch remained lighted is not certain, apparently the wind blew it out and the probabilities are that its illumination was but momentary.  There was a heavy sea running, and it is not surprising that such a brief display was not observed by those on the steamer.  The term "flare-up light" is not defined in the articles, but since it is provided as the alternative for a fixed white light at the level of the side-lights, it certainly must be one kept where it will be at hand and in proper condition when wanted, and which will not blow out in a high wind, but will burn with such continuity as to give fair warning to the approaching vessel.  We are clearly of the opinion that the schooner was in fault for failing to exhibit such a light.

The steamer was charged with fault in not having a proper lookout, because there was no one stationed at the stem or in the crow's nest.  Of this charge the District Judge says:

"The testimony shows that the coldness of the weather had caused the spray, which flew aboard the steamship, to freeze on the forward part of the vessel including the foremast, so that the removal of the lookouts to the bridge was justified by the circumstances."

In this conclusion we concur.

The steamer was also charged with fault because she was going at full speed, 15 to 17 miles an hour. Of this charge the District Judge says:

"If the steamship had been proceeding at a slower rate of speed, the collision could doubtless have been avoided by the reversal of her engines. The removal of the lookouts from the best positions for seeing ahead imposed a duty upon the steamship to slacken her speed, so that she would be under command and could reverse in time to avoid a collision with a sailing vessel ahead of her, which could be seen without a light exhibited astern. Full speed under the circumstances was inconsistent with the duty of the steamship to stop if there should be danger, and there was danger here which doubtless could have been seen in time to avoid it if the lookouts had not been removed from their proper stations. Their removal necessitated the precaution of reducing speed. The Java, 14 Blatchf. 524, Fed. Cas. No. 7,233."

In the Java, it was found that the sailing vessel had her regulation lights set and burning; besides the heavy head sea, there were occasional showers and some mist and the view of lookouts from the bridge was interfered with by a fore trysail.

We are unable to concur in this conclusion of the District Judge because it requires the steamer to maintain a speed so low as to avoid collision with other vessels which may be navigating without displaying lights. This, we think, lays a burden upon navigating vessels not warranted by the rules or by authority. The case of the Sarmatian is closely parallel. She was proceeding at her usual speed in the open sea. The night was dark, but lights when displayed could easily be seen; she had a full watch on deck attending to her duties. The Circuit Court held, affirming the District Court:

"She was not bound to slacken her speed until there was apparent danger [The Scotia, 14 Wall. 170, 20 L. Ed. 822], and she had the right to act on the belief that every vessel she approached would give such notice as the local usages of the place, or the general rules of the sea required. * * * Under these circumstances she might keep up her usual speed till something occurred to make it improper. Had the schooner performed this duty this speed would not have involved any loss to her." Kennedy v. The Sarmatian (C. C.) 2 Fed. 911.

We know of no authority qualifying this decision, which commends itself to us as sound and reasonable.

In the case at bar the night was dark and cloudy, but there was no fog, mist, falling snow or rain, heavy or light, and lights could be seen for miles. The watch on the schooner saw the steamer's lights 20 minutes before she struck—at least five miles away. The less powerful lights of a sailing vessel carried nearer the surface of the water could undoubtedly be seen by those on the bridge at least more than a mile away; the navigators of the steamer estimate they could have seen them from two and a half to five miles off, but if apprised of the schooner's presence when a mile away, there would have been no difficulty in avoiding her. They saw her in fact, her mast and hull, when she was one-half to one-quarter mile away. There was water coming over the

bows—"just spit water—just spray" over the starboard bow, the wind being about three points on the starboard bow; no danger to any one going forward on the deck. With the thermometer far below the freezing point, however, a lookout stationed where that spray would lash him would soon have been out of commission, the spray freezing on him as it fell, but the evidence does not warrant the conclusion that the spray rose so continuously and in such volume as to obscure the view of those on the bridge looking forward to pick up the lights which they were entitled to assume would be found on all vessels navigating in their vicinity. Between the bridge and the bows rose the mast on which the crow's nest was located, but with a lookout at each end of the bridge and two watch officers between on either side it could not have interfered with the outlook. Undoubtedly a lookout in the crow's nest which is a little forward of the bridge and 10 feet higher could have seen a ship's light further off than coul: those on the bridge; whether he could have seen a dark object, nc: visible at a distance on the horizon line, any sooner, is doubtful. There was nothing to interfere with maintaining a lookout there. He was withdrawn because the ladder was so coated with ice as to make the place inaccessible. But that is not material. If the conditions were such that those on the bridge could have seen such light so long before any risk of collision as to enable the steamer easily to avoid the other vessel either by change of course or by stopping and reversing we do not see how under the rules of navigation she can be held in fault for excessive speed.

The decree is reversed, with costs and cause remanded, with instructions to decree in accordance with this opinion.