**BRADSHAW v. THE VIRGINIA et al.**

**THE NETTIE B. GREENWELL.**

No. 5905.

United States Court of Appeals
Fourth Circuit.

Argued July 6, 1949.

Decided Aug. 10, 1949.

Henry E. Howell, Jr., and R. Arthur Jett, both of Norfolk, Va., for appellant.

Edward R. Baird, of Norfolk, Va., and Charles W. Hagen, New York City (Baird, White & Lanning, of Norfolk, Va., and Hagen & Eidenbach, New York City, on the brief), for appellees.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is an appeal in admiralty by Linwood L. Bradshaw, owner and master of the motor vessel Nettie B. Greenwell, original libellant, from a decree of the United States District Court for the Eastern District of Virginia holding the Greenwell solely at fault for a collision which occurred on the night of March 11, 1947, between the Greenwell and the steamer Virginia, and dismissing appellant's libel against the Virginia. A cross-libel by the Chesapeake and Ohio Railway Company for damages sustained by the Virginia in the collision was sustained by the District Court.

This case is of the same general pattern from which most admiralty cases unfortunately are cut. There is virtually no agreement between the parties as to certain of the crucial facts which must be decided in order to place the fault for the collision. We summarize, initially, the general facts about which there is comparatively little dispute, as found by the District Judge.

The Greenwell was a vessel of the burden of 41 gross tons, 28 net tons, 72 feet long, 19.3 feet beam, 5.3 feet deep and was owned and operated by Linwood L. Bradshaw as an oyster boat. Her hull was painted gray and her pilothouse was painted white. The Virginia is a twin screw, steel-hull passenger and freight vessel of the burden of 426 gross tons, 260 net tons, 191 feet long, 32 feet beam, 12 feet deep and at the time of the collision here involved was operated by the Chesapeake and Ohio Railway Company for the transportation of passengers and freight between Norfolk and Newport News, Virginia. Her pilothouse is about forty feet abaft her stem.

On the late afternoon of March 11, 1947, the Greenwell, under the command of appellant, who was at the wheel and acting as lookout, left the mouth of the Warwick River, partly loaded with approximately 1,600 bushels of seed oysters, bound for Hampton, Virginia.

The lights on the Greenwell were supplied by batteries which were charged by a generator operated separately and apart from the engine. Prior to the collision,

the Greenwell experienced difficulty with her lighting equipment, and immediately prior to and at the time of the collision the only light she was showing was a single white light furnished by an oil lantern on her stern abaft the pilot house. This light, obscured by the pilot house, was not visible to anyone dead ahead of the Greenwell, as was the Virginia at all times prior to the collision.

At approximately 6:45 P.M. on the same afternoon, the Virginia left her dock in Norfolk on her regularly scheduled run to Newport News, under the command of Captain Wiley, a master of many years experience, who at the time of the collision was in the pilothouse directing navigation. The regular quartermaster was at the wheel and a member of the crew, Chelsea Lawrence, was stationed as lookout on the bow just abaft the jackstaff, which carried the Virginia's forward light. The Virginia was showing proper lights at the time of the collision.

At the time of the collision the weather was good. There was no moon but the stars were out. A light haze or frost on the water somewhat obscured the shoreline, although lights could be seen at a normal distance. The tide was at the last of the ebb and neither the tide nor the wind had any appreciable effect upon the movements of the vessels.

Captain Bradshaw, on behalf of the Greenwell, testified that at about 7:25 P.M. the Greenwell was approaching C. & O. Pier No. 9, one of a number of piers jutting out into the Newport News waterfront. Although Captain Bradshaw did not testify in terms of degrees as to the Greenwell's course, it was apparantly the channel course of approximately southeast. The Greenwell's speed was about 6 knots.

When Captain Bradshaw had passed Pier No. 9, he saw the lights of a moving vessel (the Virginia) approaching Buoys Nos. 7 and 8 marking the entrance to the Newport News Channel. After clearing the buoys on a course due west, the Virginia altered course to approximately northwest by west so as to head up the James River. This course change put the

Virginia and the Greenwell on virtually opposite headings. If we add, then, the Virginia's speed of 14 knots to the Greenwell's speed of 6 knots, it is clear that the vessels were approaching headon at a relative speed of about 20 knots.

Captain Bradshaw testified that after the Virginia had settled on her new course, her port light could be observed by him, and that she bore slightly to port of the Greenwell. Thinking the situation appropriate for a port to port passage, Captain Bradshaw, according to his testimony, blew a one-blast signal when the vessels were approximately 500 yards apart, at which time he also rolled his wheel a couple of spokes to starboard to increase the passage distance. He stated, next, that, a minute having elapsed during which he received no reply to his one-blast signal, he repeated the one-blast signal and that, immediately thereafter, the Virginia altered course to her port to bear towards the Greenwell. Captain Bradshaw then sounded the danger signal and threw his wheel hard right; but, almost simultaneously with that action, the Virginia struck the Greenwell on the latter's port side at a point about 15 feet abaft her stem at an angle of about 45 degrees, cutting the Greenwell in two and rendering her a total loss.

The evidence on behalf of the Virginia, on the other hand, was that as she cleared Buoys Nos. 7 and 8 and made her customary course change, the waters ahead were apparently clear and there was no visible traffic ahead.

Upon completion of the course change, the master and the helmsman of the Virginia, both in the Virginia's pilothouse, at about the same time observed a dark object or spot on the water ahead which they first thought to be coal dust. Almost immediately thereafter the Greenwell showed up under the Virginia's bow light, and was first revealed as a vessel to those on the Virginia. At that time, those on the Virginia heard the Greenwell's danger signal. Captain Wiley, of the Virginia, instantly ordered hard right rudder and placed the engine order telegraph at full speed astern on both engines. These orders were immediately carried out but had not time to take

appreciable effect before the collision occurred.

■ No one on the Virginia heard the Greenwell's two one-blast signals. Despite testimony from other personnel on the Greenwell corroborating Captain Bradshaw in this respect, the District Judge specifically found against the Greenwell on this issue. He stated (Finding of Fact No. 8) that although the Greenwell was turned slightly to starboard when about 500 yards from the Virginia, "no other action was taken until a few seconds before the collision, when her wheel was thrown hard right and several short blasts were sounded on her horn." We certainly cannot hold that this finding "was clearly erroneous," and must therefore accept it. The conclusion seems comparatively evident either that the one-blast signals by the Greenwell were not given or that they were of insufficient volume to be heard by those on the Virginia.

A second disputed issue arises in connection with Captain Bradshaw's testimony (already noted) that the Virginia altered course to port to bear towards the Greenwell. Captain Wiley testified that from the time the Virginia completed her course change upon clearance of the Buoys Nos. 7 and 8 she maintained a steady course until almost the moment of collision, when her wheel was put hard right, and that she at no time prior to the collision turned to the left. Although the District Judge made no explicit finding on this point, implicit in his findings is the adoption of this evidence on behalf of the Virginia.

We discuss first the faults of those on the Greenwell as set forth in the District Judge's Conclusion of Law No. 1:

(a) Failure to carry proper lights,

(b) Failure to maintain a proper and competent lookout,

(c) Negligently navigating the vessel on the wrong side of the fairway or channel when the channel was not clear,

(d) Failure to obtain the assent of the Virginia to a port to port passing before undertaking such a passing, and

(e) Failure to realize the danger of collision, requiring her to reverse and stop.

■ It is quite clear that the lookout maintained aboard the Greenwell was inadequate. Captain Bradshaw was in the pilothouse acting, at the same time, as navigating officer, helmsman and lookout. Although there were four other men in the crew of the Greenwell, none was assigned the duty of acting solely as a lookout.

The unsatisfactory nature of this arrangement is plainly evidenced by the fact that at about the time she cleared Buoys Nos. 7 and 8 the Virginia passed a flotilla consisting of the tug Cape Charles and a carfloat secured along the tug's starboard side. This flotilla continued on the same course as the Virginia, made a comparable course change to starboard upon clearance of the buoys and, at the time of the collision, was about 100 yards off the Virginia's port quarter. The tug was showing red and green running lights and three towing lights rigged on the mast fifteen feet apart in vertical line; and the carfloat was carrying red and green running lights, one white light forward and two white lights aft showing all around the horizon. In other words, the flotilla was showing a minimum of 10 navigational lights and must have resembled the City of Norfolk bearing down on the Greenwell, yet Captain Bradshaw stated that *he never saw his flotilla until after the collision.*

We confess some difficulty in linking causally the Greenwell's failure to maintain a proper lookout to the collision. Captain Bradshaw admittedly saw the Virginia at a distance at which he had ample time and space, with his small maneuverable vessel in a broad channel, to avoid the Virginia. This fact, however, merely serves to emphasize his negligence in failing to take proper action to keep his unlighted vessel out of the path of the Virginia. See Conclusion of Law No. 1(c) (d) (e), above.

■ The most serious fault of the Greenwell, and that which we feel was virtually the sole cause of the collision, was, of course, her failure to carry proper lights. Although this fact was disputed at the trial, the District Judge found that the Greenwell was showing only one white light on her stern, and appellant's counsel

properly admit they must accept this finding on their appeal.

The failure to carry proper lights, required by the statutory rules of navigation, is one of the most recklessly unlawful faults a vessel can commit, and merits the severest condemnation. Waring v. Clarke, 5 How. 441, 46 U.S. 441, 12 L.Ed. 226. It has long been the rule that where one vessel, in violation of statute, is as grossly at fault as was the Greenwell here, that vessel will be held *solely* at fault unless the evidence to establish the fault of the other vessel is clear and indisputable. Cf. The Pennsylvania, 19 Wall 125, 86 U.S. 125, 22 L.Ed. 148; Taylor v. Harwood, 23 Fed.Cas. No. 13,794. As was said by Circuit Judge Swan in The B. B. No. 21, 2 Cir., 54 F.2d 532, 534: "To be relieved from the consequences of his own fault, a wrongdoer must do more than merely suggest the possibility that the tort of another may have intervened. * * * The burden of proving that an intervening act of negligence caused the loss was on the appellant." See, also, The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84; The Bartle Daly, 2 Cir., 45 F.2d 605; The Mexico, 2 Cir., 84 F. 504.

■ We recognize the principle that a vessel failing to show the proper lights will not for that reason be held solely at fault when she was in fact seen by the other vessel in time for the latter to have avoided the collision and the latter vessel negligently failed to take proper avoiding action. Chamberlain v. Ward, 21 How. 548, 62 U.S. 548, 16 L.Ed. 211. But the appellant here has not proved facts which render that principle applicable. He has not borne the heavy burden of showing that the Greenwell's failure to carry proper lights and his own failure to navigate his small, unlighted vessel so as to avoid the Virginia were not the sole causes of the collision.

The faults charged by the appellant against the Virginia are these: (1) that she was travelling at an excessive rate of speed; (2) that she had an incompetent lookout; and (3) that she failed to take proper avoiding action after sighting the Greenwell.

■ The Virginia was travelling at her regularly-scheduled speed of 14 knots. There is no statutory rule governing the speed of vessels in Hampton Roads or the James River, and the propriety of the Virginia's speed must be determined on the basis of such factors as the state of the weather and visibility, traffic conditions at the time and the maneuverability of the vessel.

■ We have already described the weather conditions. While the absence of any moonlight made it difficult to observe unlighted objects, visibility was such that lights could be seen at a normal distance. As the Virginia cleared the buoys and turned up the James River, she saw no lights ahead and was entirely warranted in assuming that the waters ahead were clear of traffic. Finally, the Virginia is a twin-screw ship and highly maneuverable. We think the District Judge properly held that, under these circumstances, the Virginia's speed of 14 knots was not excessive.

■ Proctors for appellant urge that the Virginia should have maintained a speed so low as to enable her to avoid collision with other vessels which, perchance, might have been navigating without lights. We decline to so hold. See The Kaiserin Maria Theresa, 2 Cir., 149 F. 97, 99, certiorari denied, Palson v. North German Lloyd, 204 U.S. 671, 27 S.Ct. 786, 51 L.Ed. 673; The John H. Starin, 2 Cir., 122 F. 236, certiorari denied 190 U.S. 559, 23 S. Ct. 854, 47 L.Ed. 1184.

A. H. Bull Steamship Co. v. Chesapeake Steamship Co., 4 Cir., 101 F.2d 599, and The William A. Paine, 6 Cir., 39 F.2d 586, relied upon by appellant, are clearly distinguishable. In each, the speed held to have been excessive was in violation of navigation rules—in the former, of the Narrow Channel Rule, and in the latter, of rules promulgated by the Secretary of War.

Chelsea Lawrence, a lookout of 12 years' experience on the Virginia, was stationed as lookout immediately behind a windbreak at the stem of the vessel. He was knocked overboard and drowned when, in the collision, the Greenwell's mast fell across the Virginia's bow. Since his testi-

mony was thus unavailable, we must look to other factors to decide whether he should have, or could have, seen the Greenwell sufficiently in advance of her sighting by Captain Wiley and the helmsman, on the Virginia's bridge, to have enabled the Virginia to avoid the collision. Captain Wiley testified that the lookout, when last seen by him, was at his post, apparently alert upon his duties.

Chiefly relied on by appellant to establish the lookout's incompetence is the fact that he made no report whatsoever of the Greenwell. It is argued that his station was some 30 to 40 feet forward of the station of Captain Wiley on the bridge and that he therefore should have sighted the Greenwell that distance in advance of Captain Wiley. But the light haze or frost on the water may well have given to those on the higher bridge a visibility advantage with respect to low-lying objects on the water.

The appellant cites as highly significant the testimony of Captain Williams of the carfloat that he saw the Greenwell "when she passed Pier 9," which would have been at a distance of approximately a nautical mile. A careful reading of this witness' testimony shows that it is most inconclusive as to the location of the Greenwell when he first sighted her; and, in any event, his statement is completely destroyed for appellant's purpose when he states, elsewhere in his testimony, that about five seconds elapsed between his sighting of the Greenwell and the collision. This was corroborated by the master of the tug Cape Charles who testified that the Greenwell was about 100 yards beyond the Virginia when he first sighted her, and by the mate of the Cape Charles who first saw the Greenwell when she blew the danger signal "a matter of seconds" before the collision.

■ We should be indulging in sheer speculation were we to hold the Virginia's lookout incompetent. Such evidence as the record discloses is not the type of clear and indisputable proof of the Virginia's negligence as must be shown by the Greenwell to avoid the results of her own gross neglect.

In any situation of this type, there are inevitably contradictions in the testimony as to the locations of the vessels, the times and the distances involved. Indeed, the testimony of a single witness as to the distance at which the other vessel was sighted may be so in conflict with his estimate of the time elapsing between the sighting and the collision that one or the other of these estimates must fall. But this does not necessarily—nor even generally—result from attempts to color the testimony. It is the result, simply, of human frailties in matters of observation and recollection, particularly in time of crisis.

Proctors for appellant, here, have selected isolated bits of testimony (some taken at an investigation conducted by the Coast Guard immediately following the collision, and some given at the trial below) and, basing their argument thereon, now urge that Captain Wiley and the helmsman of the Virginia first sighted the Greenwell 2 minutes prior to the collision, or at an equivalent distance of approximately ¾ of a mile, and failed to take any action whatsoever in this 2 minute period to avoid the collision. Appellant stresses, in this connection, certain testimony of the Virginia's helmsman and of the carfloat personnel which tended somewhat to show either that the Virginia's personnel recognized the dark spot on the water as a boat or that they should have assumed it to be a boat and acted accordingly. The evidence, however, does not suggest that, even had the Virginia treated the dark object as a vessel from the very instant of sighting, there was time for intelligent and effective avoiding action—especially when there is considered the complete dearth of information as to its course, speed and intentions furnished by the Greenwell.

We have read the entire record carefully and while there are admittedly conflicts left unresolved, the overwhelming weight of the evidence taken as a whole supports the finding of the District Judge that after a dark object on the water was first observed by the Virginia "less than a minute elapsed before the Greenwell showed up under the Virginia's bow light as a vessel"

and his Conclusion of Law (No. 2) that "the action of those in charge (of the Virginia) upon sighting a dark object ahead was reasonable and proper under the circumstances existing."

The evidence does not support the charges of fault on the part of the Virginia, and the decree of the District Court holding the Greenwell solely at fault for the collision is affirmed.

Affirmed.