219 F.2d 904
 Petition of H. & H. WHEEL SERVICE, Inc.
H. & H. WHEEL SERVICE, Inc.
v.
Paula CORNET, Adm'x of the Estate of Hector Cornet,
Deceased; Lena Loftus, Adm'x of the Estate of
Thomas Loftus, Deceased; and Anthony Klinicki.
Paula CORNET, Adm'x of the Estate of Hector Cornet, Deceased,
v.
H. & H. WHEEL SERVICE, Inc.
Anthony KLINICKI
v.
H. & H. WHEEL SERVICE, Inc.
Lena LOFTUS, Adm'x of the Estate of Thomas Loftus, Deceased,
v.
H. & H. WHEEL SERVICE, Inc.
 Nos. 12115-12118.
 United States Court of Appeals, Sixth Circuit.
 Feb. 16, 1955.
 
 Sparkman D. Foster, Detroit, Mich (Raymond A. Ballard and John Arthur Hamilton, of Foster & Meadows, Detroit, Mich., on the brief), for H. & H. Wheel Service, inc.
 Edward N. Barnard, Detroit, Mich., for Anthony Klinicki.
 Wm. J. Weinstein, Detroit, Mich., for Paula Cornet.
 Carl Gussin Charfoos, Gussin, Weinstein & Kroll, Detroit, Mich., on the brief for Paula Cornet.
 Nathan E. Shur, Detroit, Mich., on the brief for Lena Loftus.
 Before SIMONS, Chief Judge, and ALLEN and MARTIN, Circuit Judges,
 MARTIN, Circuit Judge.
 
 
 1
 These consolidated suits in admiralty stem from a night-time collision in the Detroit River between the Fourth Marie, a forty-seven-foot motor cruiser, and a small outboard motor boat in use by a fishing party of three men. Two occupants of the small boat were drowned and the third, its owner, was injured. The larger boat was owned by H. & H. Wheel Service, Inc. The president, manager and almost exclusive stockholder of that corporation, Clare L. Hiles, was aboard at the time of the accident. Originally, Hiles had been sole stockholder of the company but later he had transferred by gift some of his stock to his wife, his son, and his daughter. No member of his family, however, had anything to do with the wheel service business. The Fourth Marie had been customarily used both for the pleasure of Hiles, his family, and his friends and, in his business, for the entertainment of customers.
 
 
 2
 The Fourth Marie had been docked at the Detroit Yacht Club, of which Hiles was a member. Around four o'clock in the afternoon of the day of the accident, the cruiser shoved off with Hiles and his wife aboard, accompanied by friends. Their guests were Murray Knapp, former Commodore of the Yacht Club, and Mrs. Knapp; Joseph Summerlee and wife: all personal friends of the Hiles; and Ralph Burgess, an employee of Knapp. Burgess was caretaker of the latter's boat. Fred Chalcraft, another friend of Hiles, was picked up as a guest shortly after the boat had crossed the river. Burgess had been permitted by his employer, Knapp, to act as pilot of the Fourth Marie on the pleasure cruise up the Detroit River and Lake St. Claire to the party objective, a road house called the Idle Hour on Harsen's Island, some 23 miles from Detroit. Burgess had never been aboard the Fourth Marie until taken on to operate it; and this fact was known to Hiles.
 
 
 3
 Burgess was instructed by Hiles in the use of the automatic pilot with which the cruiser was equipped and was shown around the ship by Hiles who, together with Knapp, aided with the lines as the boat shoved off. On the voyage up, Hiles served his guests intoxicating liquors and admitted that he, too, had taken on several drinks while aboard the Fourth Marie. A stop was made at Miller's Tavern, where Hiles drank two or three beers. The party them proceeded to the Idle Hour, where food, liquor and wine were consumed. Hiles drank two or three beers while there.
 
 
 4
 Around ten-thirty P.M., the Hiles party left the Idle Hour for the return trip to the Detroit Yacht Club. Hiles instructed Burgess to operate the cruiser on automatic pilot. At the trial, Hiles admitted that he knew the Fourth Marie had a blind spot of between one hundred and one hundred and fifty feet. He stated further that he knew the ship was so constructed that in the pilot house directly in front of the wheels are three windows, separated by wooden partitions approximately six inches wide, and that there was a mast in the immediate center of the boat directly in front of the center window. Hiles said that when the ship was on automatic pilot, Burgess could not have handled the wheel manually. He admitted that, on the return voyage, no one was placed in the bow or elsewhere as lookout, and that both he and Burgess knew that the point where the collision occurred was in a congested area of the Detroit River. He admitted further that he knew the pilot could not see from the cabin for quite a distance ahead, by reason of the 'blind spot.'
 
 
 5
 Hiles testified that he was sitting behind Burgess in the cabin when he felt a jar from the bottom of the boat which caused him to think that the vessel might be running aground. After hearing the thump, he ran to the stern and saw debris in its wake.
 
 
 6
 Burgess testified that he saw no small boat until somebody-- he thought it was Hiles-- shouted to him to stop and 'said something about a capsized boat.' He asserted that under direction of Hiles, and also of Summerlee and Chalcraft, he turned the ship through the wreck-age in order to pick up a man who was swimming in the water. This man turned out to be Klinicki. To stop the boat, Burgess had to cut the throttle and turn the switch to take the vessel off automatic pilot. Knapp brought the search light of the ship into play. Wreckage of a small overturned boat was revealed. Two men were seen in the water, one of whom, Loftus, was clinging to the overturned boat and the other, Klinicki, was swimming toward the shore. Klinicki called out for them to save the other men, as he could take care of himself. Nevertheless, the occupants of the Fourth Marie hauled Klinicki aboard the cruiser. A small boat, which had put out from shore, picked up Loftus who could not be revived. The body of the third occupant of the small boat, Cornet, could not be found until several days later. He had been drowned immediately following the accident.
 
 
 7
 Four persons who were at a trailer camp just below Windmill Point on the Detroit side of the river witnessed the accident. Two of them, James Chapman and his wife, Joyce, testified that they saw a large boat, which both later identified as the Fourth Marie, coming down the river. Chapman said that the vessel was 'going pretty fast' and that he was amazed when he saw the 'spray which it was putting up.' He said further that its hatch was halfway up in the air. He saw a small outboard motorboat, which was not going fast, coming up stream. His wife exclaimed that she thought the big boat and the little one were 'going to hit.' They did. He heard a crash; after which, the big boat seemed to reverse its engines, for it came straight back and did not swing around. He heard calls for help. One of the men in the water shouted: 'Don't bother with me. Save the other two. They can't swim.' There were no other boats in the vicinity, Chapman declared.
 
 
 8
 Mrs. Chapman testified that, while standing on the shore beside her husband, she noticed a small boat with three men in it passing by on its way up the river. The boat had a light on. She could hear the occupants of the boat talking, but did not hear what they said. She corroborated her husband in material details.
 
 
 9
 Another husband and wife, Raymond and Evelyn Ellyson, who were sitting in their parked automobile facing the Detroit River, were also eye witnesses. They heard a cry for help from someone out on the river. Ellyson turned the spotlight of his automobile toward the river, saw the wreckage of a small boat some two hundred feet away, and observed a man clinging to the boat. Ellyson then observed the white cruiser backing up and turning its spotlight toward the wreckage. He heard a human cry: 'You have hit me with the screws.' He then saw a man's arms and head slide into the water. He heard a man, who was swimming in the river, call out that he was all right, 'get the others.' A small boat went out from shore and picked up one of the men in the water, while the cruiser picked up the other. Ellyson went to the aid of the man who was brought ashore and observed that he had a bad gash on his buttocks and a 'sort of circular cut' close to his spine. The man, who proved to be Loftus, died. Mrs. Ellyson corroborated the testimony of her husband. She identified the Fourth Marie as the large boat involved in the accident and said that she had heard the faint cries of someone: 'Help. You hit me.'
 
 
 10
 When the United States Coast Guard was called, its boat was sent out immediately to aid in the rescue. Guardsman Samp, who was aboard, testified that the Fourth Marie was there when he arrived at the scene of the accident. This was only seven minutes after he had received the call at the Coast Guard station. Only one starboard green light of the Fourth Marie was turned on and its port lights were not shining when the Coast Guard arrived. Hiles was directed to correct the condition forthwith.
 
 
 11
 The members of the Fourth Marie debarked at Belle Isle. Samp personally served Burgess black coffee when requested to do so. He testified that Burgess appeared to have been drinking intoxicating liquors, 'which could be detected from his breath.' Burgess denied that he had taken a drink that evening. Samp swore further that other members of the Hiles' party smelled of liquor. He stated that, on the night of the accident, a haze ten to twelve feet high hung over the waters in the vicinity of the point of collision.
 
 
 12
 The Vice Commander of the Coast Guard Auxiliary testified that he had followed the Coast Guard boat up the river; had observed the eight- to ten-foot haze above water level and, when he arrived at the scene of the accident, had noticed that the port light of the Fourth Marie was out. He directed those aboard the cruiser to put the lights on.
 
 
 13
 Dr. Love, medical examiner from the coroner's office, made post mortem examinations of the bodies of both Cornet and Loftus. He expressed his opinion that Cornet had not died from being drowned but that his death had been caused by hemorrhage and shock following injuries to the head, back and chest. He said that the propellers of the Fourth Marie in revolution could have caused the cuts in Cornet's back.
 
 
 14
 The doctor testified that he found two superficial wounds on Loftus' chest, and deep lacerated wounds on his back; and that the wounds could have been occasioned by a ship's propellers. It was the doctor's considered opinion, however, that the death of Loftus was caused by drowning, the wounds being only contributing causes.
 
 
 15
 Turning our attention now to the testimony of Anthony Klinicki, sole survivor of the three men who were in the small boat, we find that on the day of the accident he had taken Cornet and Loftus on a fishing expedition in his fourteen-foot outboard motorboat. Lights were attached to his boat and located in proper places. These lights were working in perfect order. Upon his return trip up the river in the late evening, Klinicki kept looking straight ahead and watched his lights very closely. He stated unequivocally that they were lighted brightly at all times. He said that Loftus and Cornet were facing forward and that he was seated on the back seat of his boat. He was going against the current at a speed of about eight or ten miles per hour. It was a hazy night. Suddenly a large boat appeared out of the darkness within a distance of 150 feet, or so. The only light he saw on the approaching boat was 'a little green dim light.' The large boat was approaching him head-on. He shouted as loud as he could, 'Look out.' and turned his boat sharply to starboard in an effort to avoid the large vessel and to pass on his right side of it. As he turned, the large boat turned at the same time to the left with the result that he could not get out of its way and his boat was cut 'right in two.'
 
 
 16
 When the port side of his boat was struck, Klinicki 'flew through the air' about ten feet and lost his shoes, jacket and cap. When he hit the water, he was knocked unconscious and went down, feeling as if he were 'lying on green grass.' Suddenly, he became conscious that he was surrounded by water and struggled to get to the surface. His lungs had almost given out when he succeeded. He coughed and sneezed to relieve himself of some of the water in his mouth and chest. Everything around him looked dark until, suddenly, a searchlight was turned on and he saw the large boat coming back toward him. He kept swimming away from the wreckage toward the shore. Looking back, he saw Loftus hanging on to what was left of the small boat. Loftus cried out for help. He was picked up by a small boat that come to his rescue from the shore. A life preserver was thrown from the Fourth Marie to Klinicki, who testified that despite his own condition he called out: 'Forget about me. I will swim to shore. Look for the other man. Mr. Cornet may be around there somewhere. Look for him.' Nevertheless, Klinicki was taken aboard the Fourth Marie.
 
 
 17
 The point is made by appellant that Klinicki, when hauled out of the water stated that his boat had been struck by a sailboat. The record shows, however, that in his original statement to officials concerning the identity of the craft which struck his boat he had said: 'It was large and it seemed to have that prop in the center. It had a green light about fifteen feet above the water, and it had the shape of a sailboat and yet could be something like a cruiser.'
 
 
 18
 On the day after the accident, Lieutenant Newman of the Detroit Police Department, who was in charge of the Harbor Master's Division, inspected the Fourth Marie. He observed fresh breaks in the paint on its bow and scuff marks on its side under the water line. He found a piece of fish line embedded in its hull and pulled out some four feet of it. Upon subsequent comparison of this line with a spool of fish line brought to him by the son of the decedent Loftus, he found the fish line taken from the cruiser's hull and that on the spool to be identical as to color and number of threads.
 
 
 19
 Lieutenant Newman took color pictures of the Fourth Marie and the small boat. These pictures were received in evidence. Based upon physical findings, which he described minutely, he expressed the opinion that the Fourth Marie had run completely over the small boat, which slid all the way under it and came out at its stern. The Lieutenant, who owned and operated a fifty-foot boat of his own, testified that, in the circumstances, it was his opinion that a lookout should have been stationed on the bow of the Fourth Marie and that a practical arrangement to that end could have been effected.
 
 
 20
 Inspector Langtry of the scientific laboratory of the Detroit Police Department testified that he had found on the stem of the Fourth Marie scratch marks on the paint; and that on its port side slightly below the water line and some eight inches back from the bow were small fragments of wood embedded in its hull. With tweezers, he had removed these wood fragments. The cedar wood taken from the hull of the Fourth Marie was found to be of the same type as that with which the small boat of Klinicki had been built. He corroborated Lieutenant Newman concerning the fish line taken from the hull of the Fourth Marie.
 
 
 21
 The appellant introduced as an expert, W. Lawrence James, formerly a Coast Guardsman in the Navy. He testified that the Fourth Marie, when it was owned by its builder, Steinhardt, had been used by the Coast Guard during the war. A crew of four men had been used in its operation when on patrol duty, and two men and a cook when employed as an identification boat. While in the service of the Coast Guard, the boat was never operated by one man. From the testimony of this expert a fair inference may be drawn that, as a result of the location of a large icebox inside the cabin, it was difficult for the pilot to look out from the port side. The witness said, moreover, that small boats customarily congregate in the area of the point of accident, between Windmill Point and Belle Isle, which is considered a 'congested area.' He asserted that, during the time the Coast Guard operated the Fourth Marie, the automatic pilot was not on. James declared that, in common sense operation, the automatic pilot should be shut off before the boat reaches the buoys.
 
 
 22
 An effective witness for appellees was Edward Wooters, a graduate engineer and merchant marine officer licensed by the United States Coast Guard to navigate and operate for hire passenger-carrying motor boats on navigable waters. The witness had conducted a navigation school in Philadelphia. He had navigated small boats in numerous rivers, including one trip up the Detroit River. He said that he had examined the Fourth Marie, which he described as a 'lovely boat' but 'a two-man boat' for the reason that there is 'just too much of a blind spot up forward from the cabin.' He stated definitely that it would not be good seamanship to let one man operate the Fourth Marie. He added that, irrespective of weather conditions, it would have been good seamanship to station a lookout on the bow of the boat, inasmuch as 'the visibility from the cabin is so poor you can't see over the bow.' He made the comment that an automatic pilot on a small ship is usually a gadget placed there from pride of ownership and has no practical purpose, except on a very long run to save 'a little bit of steering fatigue.'
 
 
 23
 In reply to a hypothetical question fairly embracing the existing conditions, he said that it would not be good practice and would not be safe to operate the Fourth Marie on automatic pilot. Asked to give the reasons for his opinion, he answered: 'You haven't any control over your vessel. Suppose your automatic pilot goes out on you just at the time you want to make a change in course. I don't like them. Not in crowded waters. The practice on large ships is the minute you take the pilot aboard your ship you take your automatic pilot off, and you do your hand steering in crowded waters. * * * An automatic pilot is a mechanical gadget. A mechanical gadget can go out of order and usually does at the wrong time. To play it safe, before entering crowded waters you should go off of automatic pilot.' The damage to the Fourth Marie's propellers was not, in his opinion, caused by the ship's striking a sandbar but bore characteristics of damage resulting from striking a small boat. Replying to a hypothetical question based upon testimony of record, he gave the opinion that the operation of the Fourth Marie on the night of the accident violated good practice, in that the ship was going too fast, and was running on automatic pilot without a lookout in a crowded harbor. He declared that the best seamen in the world come from the Great Lakes, and that he could not believe that such men as were operating the Fourth Marie could be such 'bad sailors.'
 
 
 24
 We are not impressed with the dependability of the conclusions of Professor Baier, an expert witness for appellant. His technical reasoning was not woven of the fibre of convincing logic. Neither the testimony of Ray Nutty, who went out from shore in a small boat and brought Loftus in, nor that of Joseph Summerlee, a guest on the Fourth Marie, was of any appreciable value to the defense. In our judgment, the sum total of the testimony of these three witnesses called by appellant, added to that of Hiles and Burgess, fell far short of equalling in weight the testimony of the witnesses for the appellees which has been briefly narrated.
 
 
 25
 The United States District Judge entered a final decree awarding damages to the Administratrix of Cornet, in the the amount of $37,500; to the Administratrix of Loftus, in a like amount of $37,500; and to Anthony Klinicki individually in the sum of $10,000. In this decree, it was recited that the litigation came on for hearing on a petition by the H. & H. Wheel Service, Inc., for exoneration from liability as owner of the Fourth Marie or, in the alternative, for limitation of its liability to the value of that vessel. Paula Cornet, as administratrix of her deceased husband, Hector Cornet, and Lena Loftus, in like capacity as to the estate of her husband, Thomas Loftus, and Anthony Klinicki were duly served in such proceeding. Each of them filed an answer to the petition of the H. & H. Wheel Service, Inc.; and each filed a claim in which it was averred that the Fourth Marie had been involved in a collision with an unregistered, unnumbered fourteen-foot outboard motorboat owned by Klinicki on which Hector Cornet, Thomas Loftus and Anthony Klinicki were riding
 
 
 26
 The petitioner denied that the Fourth Marie had been involved in the accident, but asserted that if it were found to to have been involved that petitioner was entitled to limitation of liability as provided in the United States Code Annotated, Title 46, sections 183 to 189. Later, in the same proceedings, the petitioner, H. & H. Wheel Service, Inc., as libelant, filed a claim against Klinicki, alleging that he was negligent in the operation of his outboard motorboat and seeking contribution from him toward any award which might be made to the estates of Cornet and Loftus.
 
 
 27
 By stipulation, the cases were consolidated for trial; and much evidence was presented and received during the prolonged proceedings.
 
 
 28
 The district court decreed that the libel filed by the H. & H. Wheel Service, Inc., against Anthony Klinicki should be dismissed; and that, inasmuch as the collision was due to the 'gross negligence' of the H. & H. Wheel Service, Inc., owner of the Fourth Marie, and was occasioned with its privity and knowledge, the corporation was not entitled to limitation of liability. The district judge did not write an opinion, but filed partial findings of fact and conclusions of law and, six months later, filed final findings of fact and conclusions of law. These findings and conclusions make plain the basis of his decree.
 
 
 29
 In his partial findings of fact and conclusions of law, Judge Picard found that the Fourth Marie ran down the fourteen-foot motorboat of which Klinicki, Cornet and Loftus were occupants; that the cruiser 'was being piloted and handled on the Detroit River in a manner and under conditions that denote gross negligence which was the proximate cause of this accident and the deaths and injuries resulting.' The court commented that, although the physical facts indicate beyond doubt that the Fourth Marie was the vessel involved in the accident, no occupant of it including the pilot, has admitted that he saw the small boat before the accident or that the Fourth Marie ran it down; and that 'this is one part of the evidence which leads the court to conclude that the Fourth Marie was being operated without regard, respect, or care, for the safety of anybody on the river that night including its own passengers.' It was found further that conduct of those in charge of the Fourth Marie was in wilful and wanton disregard for results and for the rights of others; and that liability cannot be escaped on the ground of any alleged joint venture or contributory negligence charged chiefly 'against two men who are now dead as a result of that gross negligence.'
 
 
 30
 The court found further that the pilot of the Fourth Marie had not been sufficiently alert, or 'he at least would now know that he had been in an accident.' From this it was concluded that Burgess either left his post momentarily after placing the vessel on automatic pilot, or was unwilling to admit-- from fear of consequences-- that he had been involved in an accident.
 
 
 31
 It was found as a fact that there had been no contributory negligence on the part of either Klinicki or the two decedents. The court commented that 'if any such negligence existed, it was that of Klinicki alone and did not contribute to the accident and was of minor importance.'
 
 
 32
 The judge stated that, while under the findings made, it was unnecessary to decide the issue of 'joint venture,' nevertheless as the trier of the facts he deemed it advisable to do so. The conclusion was drawn that Loftus, Cornet and Klinicki were not engaged in a joint enterprise; there was no testimony that the relationship of principal and agent or of equal right to direct and govern the conduct of each other existed; and that there was no evidence of common control of the small motorboat.
 
 
 33
 The crucial finding was made that 'the Fourth Marie was at all times under the guidance, supervision, and control of the H. & H. Wheel Service, Inc., which was aware or should have been aware that the vessel was violating many rules of navigation; and furthermore Hiles, its president, agent, and representative was privy to and had knowledge of all happenings aboard the Fourth Marie that night.'
 
 
 34
 The district court found gross negligence and violations of rules of navigation to inhere in the following facts: (1) the Fourth Marie was on automatic pilot when approaching and entering 'one of the most highly traveled waterways in the world in the heart of the season' as the result of orders or suggestions given by Hiles, who had complete control of the vessel; (2) there was no proper and adequate lookout as demanded by the existing conditions and circumstances; (3) Hiles knew that Burgess was unaware of the blind spot created by the bow of the vessel, particularly when he was sitting directly behind the wheel; (4) the Fourth Marie was running without the required red light on its port side which would cause the green light on its starboard side to be confusing to any observer approaching the Fourth Marie, whether head-on or from the starboard side of the cruiser. The district court concluded that upon accepted principles of admiralty law no limitation of liability for damages could be applied.
 
 
 35
 In his final findings of fact and conclusions of law, the district judge held that, on the question of joint venture, the testimony of Klinicki was not admissible under Michigan Statutes Annotated, Comp.Laws 1948 Mich. § 27.914, inasmuch as he was an opposite party having a personal and immediate financial inasmuch as he was an opposite party having a personal and immediate financial interest antagonistic to that of the deceased claimants. Noting that the proctors for the deceased claimants, in accordance 'with the court's wishes,' had withdrawn their objections to the testimony of Klinicki on the issue of joint venture and that this withdrawal could have resulted from pressure unconsciously put upon them by the court's request, it was held that under Michigan law an administratrix may not waive the benefits of the 'dead man's' statute. Geisel v. Burg, 283 Mich. 73, 276 N.W. 904; Thorbahn v. Walker's Estate, 269 Mich. 586, 257 N.W. 892; Hayes v. Skeman, 269 Mich. 473, 257 N.W. 866; McHugh v. Dowd's Estate, 86 Mich. 412, 49 N.W. 216.
 
 
 36
 But the court found further, unon the issue of joint venture, that even if the testimony of Klinicki were not barred by the dead man's statute, Klinicki and the dead claimants were engaged in nothing more than an exchange of social amenities. In any event, it was said that even if it were admissible, no weight could be given to Klinicki's testimony on the issue of joint venture. Mallery v. Van Hoeven, 332 Mich. 561, 52 N.W.2d 341; Daughtery v. Poppen, 316 Mich. 430, 25 N.W.2d 580; Hope v. Detroit Trust Co., 275 Mich. 213, 266 N.W. 326, were cited as authorities. The court held, moreover, that the alleged contributory negligence of Klinicki would not, under Michigan law, be imputable to his 'guest passengers.' See Bricker v. Green, 313 Mich. 218, 236, 21 N.W.2d 105, 111, 163 A.L.R. 697, wherein Judge Bushnell, writing for the unanimous Supreme Court of Michigan, said: 'The rule of imputed negligence as announced and applied in Lake Shore & Michigan Southern Railroad Co. v. Miller, 25 Mich. 274, and in subsequent cases of like character, is overruled, so far as pending and future cases are concerned.'
 
 
 37
 The court held that the failure of the H. & H. Wheel Service, Inc., to call as witnesses Murray Knapp and Fred Chalcraft raises a presumption that, had they been called as witnesses by the Wheel Service, their testimony would have been adverse to its interest. Both of them were aboard the Fourth Marie at the time of the accident, and were expert seamen familiar with handling motorboats; both were friendly to Hiles, President of the H. & H. Wheel Service, Inc.; and both were available during the progress of the trial. The court cited as authority the opinion of this court in Shuell v. London Amusement Co., 6 Cir., 123 F.2d 302, and opinions of the Supreme Court of Michigan in Leeds v. Masha, 328 Mich. 137, 43 N.W.2d 92; Fontana v. Ford Motor Co., 278 Mich. 199, 270 N.W. 266; Green v. Detroit United Ry., 210 Mich. 119, 127, 177 N.W. 263.
 
 
 38
 The finding was made that there was no established custom of boat owners operating in the Detroit River to post lookouts. The custom was considered immaterial in the instant case if contrary to law or good eamanship in the circumstances. 33 U.S.C.A. § 293; section 28 of Pilot Rules for Great Lakes.
 
 
 39
 Finally, the court entered succinct findings upon the question of damages justly to be awarded the estates of the respective decedents, both of whom were found to have been guest passengers on Klinicki's boat at the time of the tragic collision. These particular findings will be discussed toward the end of the opinion.
 
 
 40
 After consideration of the entire evidence disclosed in the several record appendices and of all issues argued in the briefs of the contending parties, we are of opinion that correct decision may be reached by determination of whether or not the findings of the district judge upon the issues of negligence and contributory negligence are supported by substantial evidence and are not clearly erroneous; whether, as a matter of fact, Hiles, President and principal stockholder of the H. & H. Wheel Service, Inc., was, by the same standard of proof, in supervision and control of the navigation of the Fourth Marie, and whether he was privy to and had knowledge of the operations on board that vessel on the night of and at the time of the accident.
 
 
 41
 In Kulack v. The Pearl Jack, 6 Cir., 178 F.2d 154, 155, this court stated that it is the rule in this and in other circuits that 'while an appeal in admiralty is a trial de novo, the findings of the district court will be accepted unless clearly against the preponderance of evidence. (Citing three case cases from the Sixth Circuit and one from the Second Circuit.)' See also authorities from the Seventh Circuit: Miller v. Standard Oil Co., 199 F.2d 457; Mullen v. Fitz Simons & Connell Dredge & Dock Co., 199 F.2d 557, 559; and Koehler v. United States, 7 Cir., 187 F.2d 933, 936.
 
 
 42
 We think the testimony which has been narrated clearly establishes the proposition that the district judge had abundant substantial proof upon which to rest his logical decision that the Fourth Marie was being operated at the time of the accident in a negligent manner under the supervision and control of Hiles, who was privy to and had knowledge of such negligent operation.
 
 
 43
 The evidence considered on the whole falls short of showing that Klinicki, or either of the two decedents aboard his motorboat, was guilty of negligence which contributed to the fatal accident. This being true, the district court properly held that H. & H. Wheel Service, Inc., was not entitled to exoneration, or to limitation of liability.
 
 
 44
 The principal facts upon which liability resultant from the negligent operation of the Fourth Marie is grounded may be thus summarized: (1) The vessel was so constructed as to impair the visibility of the pilot and to create a 'blind spot,' making it difficult for him to see ahead for quite a distance; (2) Hiles had knowledge that Burgess had not piloted the Fourth Marie previously and was unfamiliar with the peculiarities of its construction; (3) Hiles knew, or should have known, that a 'lookout,' in addition to a pilot, was essential to the safe operation of the Fourth Marie; (4) The Fourth Marie, not being a one-man boat, was being operated without a sufficient crew; (5) When Pilot Burgess came aboard, Hiles instructed him concerning the use of the automatic pilot, which was employed in the operation of the Fourth Marie, in a congested area, in waters covered by a haze at the time of the accident; (6) Hiles and some of the others aboard ship aided with the lines, thereby doing crew work, and Hiles on a few occasions stood beside Burgess and acted as lookout from the cabin; (7) Hiles knew, or should have known that a lookout within the enclosed cabin was inadequate and that the only place for proper stationing of the lookout was on the bow of the ship; (8) Both Hiles and Pilot Burgess knew that the area being navigated at the time of the accident was a much traveled waterway, wherein numerous small boats customarily congregated; (9) Hiles permitted the pilot, Burgess, to operate the Fourth Marie at a speed much too high under the existing circumstances and conditions; (10) The Fourth Marie was running without the required red light on its port side, which, to the knowledge of Hiles, would naturally confuse approaching boat navigators, as it did Klinicki at the time of the accident; (11) Hiles admitted having consumed several drinks, both aboard ship and while on shore. Some of his guests were also drinking; (12) Burgess recognized Hiles as being in command of the Fourth Marie: Hiles was sitting close behind him in the cabin. Clearly Hiles was privy to the navigation and operation of the ship at the time of the accident.
 
 
 45
 Under the pertinent statute, section 183(a), Title 46 U.S.C.A., the limitation of liability of the owner to the value of his interest in the vessel comes into play only when an injury by collision was occasioned by acts done 'without the privity or knowledge' of the owner.
 
 
 46
 This court, in Austerberry v. United States, 169 F.2d 583, 594, has held that privity, like knowledge, turns on the facts of each particular case; and that, in order to limit liability, the burden rests upon the owner of a vessel to prove that he had no privity or knowledge, or means of knowledge, of the negligent operation by those to whom had been entrusted the duties of commanding, maintaining and operating the vessel. See also Kulack v. The Pearl Jack, D.C.W.D.Mich., 79 F.Supp. 802, 806.
 
 
 47
 In our view, the following authorities support the finding of fact by the district court that appellant, H. & H. Wheel Service, Inc., was negligent in failing to keep a proper lookout and that this negligence was one of the efficient causes of the collision. British Columbia Mills Tug & Barge Co. v. Mylroie, 259 U.S. 1, 42 S.Ct. 430, 66 L.Ed. 807, opinion by Chief Justice Taft; The Ariadne, 13 Wall. 475, 20 L.Ed. 542; United States v. The Adrastus, 2 Cir., 190 F.2d 283; Gulf Oil Corporation v. The Socony No. 16, 2 Cir., 162 F.2d 869, 870; The Big Chief, D.C.E.D.Mo., 75 F.Supp. 496, 502.
 
 
 48
 The district court is well supported both in fact and in law upon its finding that the operation of the Fourth Marie was negligent in the failure to have lights on the port side of the vessel. As was said in Bradshaw v. The Virginia, 4 Cir., 176 F.2d 526, 530, certiorari denied 338 U.S. 892, 70 S.Ct. 244, 94 L.Ed. 548: 'The failure to carry proper lights, required by the statutory rules of navigation, is one of the most recklessly unlawful faults a vessel cam commit, and merits the severest condemnation.' See also Waring v. Clarke, 5 How. 441, 46 U.S. 441, 12 L.Ed. 226.
 
 
 49
 Considering together the testimony of the expert witnesses on both sides, Wooters, James, Samp and Baier, we think the district judge was supported in his finding that the Fourth Marie was negligent at the time of the collision, in being operated on automatic pilot in the congested area in which the accident happened. Even Summerlee, a witness for the appellant company, was condemnatory of the use of an automatic pilot. He was emphatic in saying: 'I have no damn use for them.' The pilot, Burgess, stated that when the automatic pilot is on, it does away with manual steering; that the vessel keeps on heading in the direct course set for it; but that some head work is needed in addition to an automatic pilot, especially when the vessel is being driven at night and has only a light in the distance to guide it. Burgess admitted that he was acting simultaneously as pilot, navigator and lookout. This was, of course, well known to Hiles and was apparently approved by him; and, in the circumstances, constituted negligence in and of itself.
 
 
 50
 Appellant contends that in the waters of the Detroit River it was not customary to place a lookout on the bow. The custom in the operation of boats is immaterial if a particular custom is contrary to law. The Tillicum, D.C., 217 F. 976, affirmed 9 Cir., 230 F. 415. A longtime custom does not make a dangerous procedure safe. A. H. Bull S.S. Co. v. Chesapeake S.S. Co., 4 Cir., 101 F.2d 599.
 
 
 51
 It should be noted that section 28 of the Pilot Rules of the Great Lakes provides that no vessel or the owner or master or crew thereof shall be exonerated from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of a neglect of any precaution required by the ordinary practice of seamen, or by the special circumstances of the case. See section 293, Title 33, U.S.C.A.
 
 
 52
 Inasmuch as we have found that there is substantial evidence to support the findings of the district judge that the operation of the Fourth Marie was being conducted in a negligent manner, that neither Klinicki nor the decedents were guilty of contributory negligence and that the findings are not 'clearly erroneous,' it would be idle to pause to discuss the question of whether the testimony of Anthony Klinicki concerning his engagement in an alleged 'joint venture' with the two decedents was or was not admissible in view of the Michigan Dead Man's Statute. We are not inclined to indulge in mere dicta.
 
 
 53
 Where we are upholding the district court in its finding that Klinicki was not guilty of contributory negligence, it is, of course, unnecessary and we deem it inappropriate, to enter upon a discussion as to whether, under Michigan law, his contributory negligence would have been imputable to his 'guest passengers,' the decedents, Cornet and Loftus. We have heretofore stated the holding of the Supreme Court in the important case of Bricker v. Green, 313 Mich. 218, 21 N.W.2d 105, 163 A.L.R. 697.
 
 
 54
 Inasmuch as it is clear that there was adequate and substantial evidence to support the facts found by the district court both as to negligence and to contributory negligence, it would be fruitless to discuss the applicability of the legal proposition that the failure of the appellant company to call Knapp and Chalcraft as witnesses raises a presumption that, had they been called, their testimony would have been unfavorable to the h. & h. Wheel Service, Inc.
 
 
 55
 Both the administratrix of Cornet and the administratrix of Loftus, by cross appeal, challenge the adequacy of the awards by the district court of the same sum to each-- $37,500-- as damages for the pecuniary loss to each resultant from the death of their respective husbands. The rule in Michigan in respect of the function of the reviewing court on the issue of damages has been stated in Michaels v. Smith, 240 Mich. 671, 675, 216 N.W. 413, 414: 'Not being triers of the facts, we should not substitute our judgment for that of the jury on the question of the size of the verdict unless it was secured by improper methods, or unless we are satisfied that prejudice, sympathy, or some unreasoned element of an important character entered into the jury's consideration of the case.' The same reasoning naturally applies to a case where a judge and not a jury is the trier of the facts. As to damages, the federal rule is that the amount to be awarded rests with the trial court and is reviewable only when an abuse of discretion is shown. Dubrock v. Interstate Motor Brake System, 3 Cir., 143 F.2d 304, 308. In the instant case, the damage allowances awarded the administratrix of each decedent, and the award to Klinicki, which the H. & H. Wheel Service, Inc., insists was excessive, are soundly supported by substantial evidence and certainly do not evince an abuse of discretion by the trial judge.
 
 
 56
 The district court found that Hector Cornet, at the time of the accident on July 15, 1951, was 53 years old, in good health, and gainfully employed in a skilled trade as tool and die maker; that he was earning in such capacity about $158 per week; that, up to the time of trial, his wages, had he lived, would have approximated $178 per week; that his funeral bill was $1,195.36; and that his widow, who was 52 years old on the day he was drowned, was solely and completely dependent upon him.
 
 
 57
 As to Thomas Loftus, the district court found that he was 55 years old at the time he met his fatal accident, was in good health and gainfully employed as a skilled tool and die maker earning.$128.50 per week; that, had he lived up to the date of the trial, he would have earned approximately $148.50 per week; that his funeral expenses were $858.45; and that he left surviving him his widow, 51 years of age, and two minor children aged, respectively, 12 and 14 years.
 
 
 58
 As to Anthony Klinicki, the court found merely that he had suffered damages to his small boat and to himself, in personal injuries, to the extent of $10,000. Summarizing the evidence upon which the $10,000 award to him was based, we find that he was 43 years of age at the time of the trial, thus enjoying a life expectancy of more than 26 years. He had been a tool and die maker for some twelve years and was earning around $2.28 per hour. His dependents were his wife and his two daughters, aged 12 and 5 years, respectively. He was in good health before the accident, but, afterwards, displayed symptoms of shock. He testified that he suffered from nightmares, and awakened in the mornings as tired as when he went to bed. He had headaches occasionally. He felt tenderness, soreness and pain in his right arm; and his right knee was injured so that he could not kneel without pain. He swore that before the accident he was a jovial person but afterward he found it difficult to get along with people, and had difficulty in remembering things. Dr. Slevin, who examined Klinicki, described certain physical injuries which he found and attributed to the accident. The patient's subjective symptoms were attributed by the doctor to shock from the accident.
 
 
 59
 Before he became a tool and die maker, Klinicki had been for a long time a professional musician. Prior to coming to Detroit, he had been an instructor in music. He picked up small sums occasionally from playing with orchestras in Detroit. He testified that after the accident he was unable either to play or to teach music. He declared that for more than six months after the accident his suffering caused him to lose time from work. He estimated the damage to his motorboat and his loss in fishing tackle and clothing at $600. An award to him of $10,000 was, in view of the foregoing testimony, supported by substantial evidence and was not clearly erroneous.
 
 
 60
 The decree of the district court is in all respects affirmed.